MAUDE L. WAHLIG v. KRENNING-SCHLAPP GROCER COMPANY and METROPOLITAN CASUALTY INSURANCE COMPANY, Appellants.—29 S. W. (2d) 128.

Division Two, June 11, 1930.

678

*Case, Voyles & Stemmler* for appellants.

*Oliver A. Fabick* for respondent.

680

HENWOOD, C.—On April 11, 1928, Maude L. Wahlig, widow of George A. Wahlig, filed with the Workmen's Compensation Commission her claim for death benefits against Krenning-Schlapp Grocer Company, the employer of the deceased, and Metropolitan Casualty Insurance Company, the insurer. A hearing before the commission resulted in a final award of $150 for burial expenses, and a total death benefit of $9,486, or the sum of $20 per week for 474.3 weeks. The employer and insurer took an appeal to the Circuit Court of the City of St. Louis, where a judgment was entered affirming the findings and final award of the commission, and from that judgment the employer and insurer have appealed to this court.

The claim and the answer thereto, filed with the commission, constitute the pleadings in the case. In the claim it is alleged that the death of the claimant's husband was caused by an accident arising out of and in the course of his employment. In their answer the employer and insurer deny that the accident arose out of and in the course of the employment of the deceased.

The judgment of the circuit court recites that, on August 17, 1928, the commission made the following findings and the following final award:

"That on December 13, 1927, at St. Louis, Missouri, George A. Wahlig died as the result of injuries sustained by him on December

12, 1927, in St. Louis, Missouri, in an accident when he was struck by a train; that, at the time, he was in the employment of Krenning-Schlapp Grocer Company as a salesman and collector; that, at the time of the accident, he was engaged in his employment; that the accident arose out of and in the course of his employment; that, before and at the time of said accident, the employer and employee had elected to accept the Workmen's Compensation Act; that the employee's average weekly wages were $47.43; that, at the time of the accident and death, Maude L. Wahlig was his widow and was a total dependent; that compensation is due in the sum of $20 per week for 474.3 weeks, or a total of $9,486; that said commission on said August 17, 1928, found and awarded compensation for said accident against the employer and insurer in the sum of $150 for burial expenses, and compensation in favor of Maude L. Wahlig, widow, in the sum of $20 per week, for 474.3 weeks, or until her prior death or re-marriage, with the remainder to Ardella Wahlig, as her interest may hereafter appear; each of said payments to begin as of December 13, 1927, and to be payable and be subject to modification and review as provided in the Workmen's Compensation Act.''

The evidence offered by the claimant at the hearing before the commission, is, in substance, as follows:

George A. Wahlig was thirty-six years of age at the time of his death, and, at the time of the hearing, his wife, Maude L. Wahlig, was thirty-five years of age, and their daughter, Ardella Wahlig, was eleven years of age. They lived at 612 Dover Street in the city of St. Louis, and Wahlig was employed by Krenning-Schlapp Grocer Company of the City of St. Louis as a salesman and collector. He had been so employed for about fifteen years. The territory in which he worked included the city of St. Louis, St. Louis County, and Scott Field, Illinois. In that territory he was free to call on any customer or prospective customer of his employer, except the regular customers of his employer's other salesmen, and he was permitted to choose his routes and means of transportation in covering his territory. He had no regular working hours and sometimes worked as late as seven and eight o'clock in the evening. His employer knew that he called on customers later than 5:15 in the afternoon. Before leaving his home in the morning he frequently solicited orders by telephone and reported the same to the office of his employer by telephone or mail. He used his own automobile in traveling over his territory and paid the operating expenses incident thereto out of his earnings. His employer preferred that its salesmen use automobiles, and thirty-three of its thirty-six salesmen used automobiles. Oscar Gould, who conducted a store at 6846 Flyer Avenue in the city of St. Louis, was a regular customer of Wahlig's em-

ployer, and it was Wahlig's custom to call on Gould about 5:30 every Monday afternoon. Wahlig talked to Gould over the telephone in the morning of Monday, December 12, 1927, and arranged to call at Gould's store in the afternoon of that day. On Saturday of the previous week, Wahlig was instructed by Mr. Pavitt, the secretary and treasurer of his employer, to see Gould on Monday and collect a payment on Gould's account. Wahlig left his home in the morning of Monday, December 12, 1927, and about 5:15 in the afternoon of that day, while driving westwardly on Delor Street, and across the tracks of the Missouri Pacific Railroad Company, in the city of St. Louis, his automobile was struck by a northbound passenger train. The injuries received by him in the collision resulted in his death on the following day. He had not called at Gould's store on the day of the accident, but was traveling in that direction at the time the accident occurred. After the accident "his order books, price books and other paraphernalia used in his selling" were found in his automobile. It was his custom, when not "on duty," to keep these books and "other paraphernalia" at his home. Delor Street is a "logical thoroughfare" to use in going west to Gould's store, and Wahlig "always did go that way." Delor Street is "5000 south," and crosses the railroad tracks three blocks west of Grand Boulevard. Gould's store, at 6846 Flyer Avenue, is in the southwest section of St. Louis, "6800 west and about 3500 south." Wahlig's home, at 612 Dover Street, is "5800 south" and about four blocks east of Grand Boulevard. Wahlig's gross earnings during the year next preceding the accident were $2895.24. The operating expenses of his automobile amounted to $35 per month, or a total of $420 leaving him net earnings of $2475.24.

No evidence was offered by the employer nor the insurer.

I. Appellants contend that the evidence does not support the finding of the commission "that the accident (which resulted in Wahlig's death) arose out of and in the course of his employment," within the meaning of Section 3 and Section 7 (c) of our Workmen's Compensation Act.

Section 3 provides that: "If both employer and employee have elected to accept the provisions of this act, the employer shall be liable irrespective of negligence, to furnish compensation under the provisions of this act for personal injury or death of the employee *by accident arising out of and in the course of his employment,* and shall be released from all other liability therefor whatsoever, whether to the employee or any other person." [Laws 1927, p. 492.] (Our italics.)

In Section 7 (c) the framers of the law say: "Without otherwise affecting either the meaning or interpretation of the abridged

clause, 'personal injuries arising out of and in the course of such employment,' it is hereby declared not to cover workmen *except while engaged in, or about the premises where their duties are being performed, or where their services require their presence as a part of such services.''* [Laws 1927, p. 496.] (Our italics.)

In determining the question thus presented, we are called upon, for the first time, to construe the most vital provisions of our comparatively new compensation law, and naturally we look, for guidance, to the decisions in other jurisdictions whose compensation laws contain the same or similar provisions.

It has been quite uniformly held that an injury arises *"out of"* the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury; and that an injury to an employee arises *"in the course of"* his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto. [See Kiser on Workmen's Compensation Acts, Secs. 64 and 72 (40 Cyc., following p. 2880), and cases cited.] We think we should so construe these terms as used in Section 3 of our compensation law, which says that ''the employer shall be liable to furnish compensation for personal injury or death of the employee by accident arising *out of* and *in the course of* his employment.'' And we do not agree with appellants in the contention that Section 7(c) limits the protection of the law to employees who may be injured *in or about the premises of their employer*. The language used in Section 7(c) does not indicate that any such limitation was intended and it cannot be so interpreted. By declaring in Section 7(c) that injuries to employees arising *out of* and *in the course of* their employment, as provided for in Section 3, shall cover injuries to employees ''while engaged in, or about *the premises where* their duties are being performed, or *where* their services require their presence as a part of such services,'' the Legislature, in our opinion, intended to extend the protection of the law to all employees while in or about *any premises where* they may be engaged in the performance of their duties, and while at *any place where* their services, or any act, task or mission which forms a necessary part of their services, may reasonably require them to be. That the Legislature intended to provide compensation for injuries to employees which may occur at places other than in or about the premises of their employer is further indicated by Section 11, which says, among other things, that, where a third person is liable for the injury or death of an employee, the employer shall be subrogated to the right of the employee or his dependents

against such third person, and that any recovery by the employer against such third person, *"in excess of the compensation paid by the employer,"* shall be paid to the employee or his dependents, and treated as an advance payment on *"any future installments of compensation."* (Our italics.)

The courts of Great Britain and a large majority of our sister states have consistently held that street accidents may arise *out of* and *in the course of* one's employment. The following quotations are very illuminating on this question:

"If a servant in the course of his master's business has to pass along the public street, whether it be on foot or on a bicycle, or on an omnibus or car, and he sustains an accident by reason of the risks incidental to the streets, the accident arises out of as well as in the course of his employment." [Dennis v. White, Ann. Cas. 1917E 1. c. 326.]

"If the work itself involves exposure to perils of the street, . . . the employee passes along the streets when on his master's occasions under the protection of the statute. . . . Cases may arise where one is hurt in the street but where the risk is of a general nature, not peculiar to the street. Lightning strikes fortuitously in the street; bombs dropped by enemy aircraft do not expose to special danger persons in a street as distinguished from those in houses. . . . The danger must result from the place to make it a street risk, but that is enough if the workman is in the place by reason of his employment, and in the discharge of his duty to his employer." [Katz v. Kadans & Co., 232 N. Y. 1. c. 421.]

"Where a traveling man is injured by an automobile while he is attempting to board a street car to go to his employer's factory to report his sales and receive instructions after returning from a trip his injury arises out of and in the course of his employment." [Porter Co. v. The Industrial Commission, 301 Ill. 76 (Syl. 5).]

"It is a well-established rule of law in compensation cases, that where an employee, in the performance of his duties as a traveling salesman, is required to use the streets of a city, such streets become his place of work, and the hazard incident to travel thereon, including the danger of coming in contact with moving street cars, is a danger incident to his employment. . . . The mere fact that the hazard is one to which every person on the street is exposed is not sufficient to defeat compensation. . . . It is also the law that where an employee charged with the performance of a duty is found injured at a place where his duty may have required him to be, there is a natural presumption that he was injured in the course of, and in consequence of, the employment. . . . In the case at bar, there is no direct evidence as to

what Conner was doing at the street crossing where, and at the time, he received the fatal injury; but since, as shown by the evidence, and as found by the Industrial Board, his work required him to travel in all parts of the city, the routes for the different days of the week being of his own choosing, and that if anything off the route for any day required his attention, it was his duty to go and attend to it; and since the evidence and finding show that he had an account or two left over from a previous day, and that he had not yet made his report to his employer, which was a part of the day's work, it is a legitimate inference which the Industrial Board had a right to draw, that the accident which resulted in the injury and death of Conner arose out of and in the course of his employment." [Capital Paper Co. v. Conner, 81 Ind. App. l. c. 547.]

The interested reader will find rulings to the same effect in M'Neice v. Singer Sewing Machine Co., 48 Scot. L. R. 15; Heffernan v. Secretary of State, 52 Ir. L. T. 157; Palmer v. Main, 209 Ky. 226; Stockley v. School District, 231 Mich. 523; Mahowald v. Thompson-Starrett Co., 134 Minn. 113; London & Lancashire Co. v. Industrial Accident Commission, 35 Cal. App. 681; Industrial Commission v. Hunter, 73 Colo. 226; Zeier v. Boise Transfer Co., 43 Idaho, 549.

In view of our construction of Section 3 and Section 7(c), and in the light of these eminent authorities, how stands the case now before us? Wahlig was employed as a traveling salesman and collector. His territory included the city of St. Louis, St. Louis County, and Scott Field, Illinois. His employer preferred that he travel in an automobile, and he did so with his employer's knowledge and consent. He was permitted to choose his routes in traveling from one customer to another. He had no regular working hours and worked as late as seven and eight o'clock in the evening. His employer knew that he called on customers later than 5:15 in the afternoon. It was his custom to call at Oscar Gould's store in the city of St. Louis about 5:30 every Monday afternoon. On Saturday, December 10, 1927, his employer instructed him to see Gould on the following Monday and collect a payment on Gould's account. On Monday morning, December 12, 1927, he talked to Gould over the telephone and arranged to call at Gould's store in the afternoon. He left his home in the morning of that day, with his order books, price books and "other paraphernalia" used in selling goods, and did not return to his home. About 5:15 in the afternoon of that day, his automobile was struck by a train while he was traveling westwardly on Delor Street in the city of St. Louis. As the result of injuries received by him in the accident, he died the next day. He did not reach Gould's store that day. He was traveling in that direction, and along his usual route to Gould's

store, at the time of the accident. He was not traveling in the direction of his home at the time of the accident. His order books, price books and "other paraphernalia" were found in his automobile after the accident. From these facts, it may be reasonably inferred that Wahlig was engaged in the performance of his duty of calling on his employer's customers on the day of the accident; and that, at the time of the accident, he was on his way to the store of Oscar Gould, one of his employer's customers, at the customary time, using his customary means of transportation, and traveling along his customary route. It being so established, the commission was fully warranted in finding that the accident which resulted in his death arose "out of" and "in the course of" his employment. In other words, it is our conclusion that the duties of Wahlig's employment necessarily exposed him to the danger of having his automobile struck by a train while traveling in his automobile on and along public streets and thoroughfares, and that the injuries which resulted in his death were the direct and natural result of a risk reasonably incident to his employment.

II.  Appellants further contend that the total death benefit of $9,486, or $20 per week for 474.3 weeks, awarded by the commission in this case, exceeds the amount authorized by our compensation law, and that "the commission has no power to make an award for the death of an employee in excess of $20 a week for 300 weeks, or a total of $6,000."

This contention calls for the construction of Section 21 of our compensation law, which deals exclusively with the subject of death benefits. The provisions of this section with which we are now particularly concerned read as follows:

"Sec. 21.  If the injury causes death, either with or without disability, the compensation therefor shall be *as provided in this section.*" [Laws 1927, p. 502.]

"(b)  The employer shall also pay to the total dependents of the employee *a single total death benefit*, the amount of which shall be determined in the following manner to-wit: There shall first be determined as a basis for computation 66⅔ *per cent of the employee's average weekly earnings* during the year immediately preceding the injury *as provided in section 22* and such amount shall then be *multiplied by three hundred* and the amount so determined shall be *the amount of such death benefit.*  The death benefit provided for shall be payable in installments in the same manner that compensation is required to be paid under this act, but in no case less than at the rate of six dollars per week nor more than *twenty dollars per week.*  There shall, however, be deducted from such death benefit any compensation which may have been paid to the employee

during his lifetime for the injury resulting in his death." [Laws 1927, p. 503.] (Our italics.)

Sec. 22, provides that "the basis for computing the compensation provided for in this act shall be as follows:

"(a) The compensation shall be computed on the basis of the annual earnings which the injured person received as salary, wages or earnings if in the employment of the same employer continuously during the year next preceding the injury." [Laws 1927, p. 504.]

The total death benefit of $9,486, or $20 per week for 474.3 weeks, awarded by the commission in this case, was calculated in accordance with Section 21 (b) and Section 22 (a), as shown by the following figures:

Wahlig's net earnings during the year next before the accident were $2475.24. His average weekly earnings were $47.43 and 66⅔ per cent of his average weekly earnings was $31.62; $31.62 multiplied by 300 equals $9,486; $9,486 in installments at the maximum rate of $20 per week equals $20 per week for 474.3 weeks.

The first clause of Section 21 says: "If the injury causes death, either with or without disability, the compensation therefor shall be *as provided in this section.*" This clearly indicates, we think, that the Legislature intended to make Section 21 independent of every other section of the law except the sections referred to in Section 21. Section 21(b), which prescribes the method of computing and paying death benefits, says that the employee's average weekly earnings during the year next before the accident shall be determined "as provided in Section 22," and that "The death benefit provided for shall be payable in installments in the same manner that compensation is required to be paid under this act." The manner of payment thus referred to is provided for in Section 14(b), as follows: "Compensation shall be payable as the wages were paid prior to the injury, but in any event at least once every two weeks." Section 21(b) also says: "There shall, however, be deducted from such death benefit any compensation which may have been paid to the employee during his lifetime for the injury resulting in his death." Did the Legislature intend to otherwise limit the amount of the death benefit in any case, or to limit the period of the installment payments thereof to three hundred weeks? We think not. True, Section 7(b) provides, in effect, that no death benefit shall be paid unless the death of the employee occurs within three hundred weeks after the accident. But, we find nothing in this section, nor in any other section of the law, which indicates an intention to limit the installment payments of death benefits to a period of three hundred weeks. In this connection, it should be noted that Sections 15, 16 and 17 provide for the payment of compensation for disability resulting from various kinds of injuries for periods ranging from *eight to four hundred weeks;* and that

Section 18(a) provides for the payment of compensation "for life" in cases of permanent total disability. Having thus specified the periods during which compensation shall be paid for various classes of disability, we may reasonably assume that the Legislature would have limited the period during which death benefits shall be paid if any such limitation had been intended. Moreover, there was no reason for specifying the period during which death benefits shall be paid, because Section 21(b) prescribes the method of computing the *total amount* of the death benefit in any case, and the *rate per week* of the installment payments thereof, and *the manner* in which such installments shall be paid. This, in our opinion, is the proper construction of Section 21(b). We conclude, therefore, that the total death benefit in this case was correctly computed by the commission, and that the total amount awarded does not exceed the amount authorized by our compensation law.

This disposes of all of the questions presented for our consideration on this appeal. In accordance with our conclusions, the judgment of the circuit court is affirmed. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.