MAURICE J. CASSIDY and THERESA C. CASSIDY v. ETERNIT, INC., and ROYAL INDEMNITY COMPANY, Appellants.—32 S. W. (2d) 75.

Division Two, October 13, 1930.

*Case, Voyles & Stemmler* for appellants.

HENWOOD, C.—Maurice J. Cassidy and Theresa C. Cassidy, father and mother, and Jean Catherine Cassidy, sister, of Maurice J. Cassidy, Jr., deceased, filed with the Workmen's Compensation Commission their claim for death benefits against Eternit, Inc., the

employer of deceased, and Royal Indemnity Company, the insurer. A hearing on their claim before the Commission resulted in a final award of $150 for burial expenses, and a total death benefit of $13,200, or the sum of $10 per week for 660 weeks to Maurice J. Cassidy, and the sum of $10 per week for 660 weeks to Theresa C. Cassidy. The employer and insurer took an appeal to the Circuit Court of the City of St. Louis, where a judgment was entered affirming the final award of the Commission in all particulars, and from that judgment the employer and insurer have, in due course, perfected an appeal to this court.

The evidence adduced at the hearing before the Commission is substantially as follows: At the time of the accident in question, the Eternit Company was engaged in the construction of a plant in the city of St. Louis, in which it was to manufacture asbestos shingles and building products. It was acting as the general contractor and had general supervision over the construction work, but some of the work was being done by independent contractors. The Morgan Hauling Company, as an independent contractor, had the job of erecting some cranes and other machinery. The work of the Morgan Hauling Company required the services of a hoisting engineer to operate the air hoist on one of its automobile trucks. A controversy arose as to whether this hoisting engineer should be placed on the pay roll of the Eternit Company or the Morgan Hauling Company, and it was finally determined that this hoisting engineer would be paid by the Eternit Company in the same manner as the hoisting engineer who was operating the overhead crane. Under this arrangement, Maurice J. Cassidy, Jr., went to work on the morning of Friday, July 8, 1927, for wages of $1.50 per hour, or $12 per day. All workmen on this job quit work at twelve o'clock noon on the following day, Saturday, July 9th. Shortly before twelve o'clock on that day, while climbing down a ladder to the cage of the overhead crane, Cassidy came in contact with a highly charged electric wire of the overhead crane, and was thereby caused to fall, about forty feet, to his death.

P. J. Brice, representative of the Hoisting Engineers' Local, testified that Cassidy went to work as a member of the Eternit Company's crew, subject to the orders of the foreman of the Morgan Hauling Company, and was placed on the pay roll of the Eternit Company, in furtherance of an agreement to that effect.

Paul McCorkle, plant manager of the Eternit Company, testified that the independent contractors, including the Morgan Hauling Company, were doing the work on a "time and material plus basis;" that Cassidy was on the pay roll of the Eternit Company; and that the Morgan Hauling Company "got no percentage" on Cassidy's wages.

Moody Crews, foreman of the Morgan Hauling Company, testified that Cassidy was employed by the Eternit Company, but that Cassidy was subject to his orders and directions in operating the air hoist on one of the Morgan Hauling Company's trucks. He further testified as follows:

"Direct Examination.

"Q. Mr. Crews, how long before you learned of Mister—of young Cassidy's death was it that you had seen him or talked to him? A. It was exactly nine minutes to twelve.

"Q. That was the time when you last talked to him? A. Yes, sir.

"Q. And at that time what did he say to you or what did you tell him to do, if anything? A. He came up to me and asked me what time it was and I told him, I pulled out my watch and I said, it is nine minutes to twelve, and he asked me whether he had to make any more hoists before noon or not and I told him I didn't have any, I just got through raising the posts and we had to bolt it up in its place and it would take quite a while to do that and we would not need any more before dinner. He said, 'Where am I supposed to get my check at?' I told him that I didn't know whether they brought the checks around or whether he was supposed to line up at the office, so I told him to go up and see the other engineer on the other crane that is in operation and he will inform you where to get your check at.

"Cross Examination.

"Q. Had this other engineer ever told you to send to him anybody that inquired about checks? A. No, sir.

"Q. Had anybody in the employ as far as you know of the Eternit Company told you where to send men who might inquire of you where they would get their checks? A. Well, some time previous, that is, before this accident happened, there was a little argument up there about who was supposed to pay this engineer that was operating there before, but I don't know, I don't know much about this, and Mr. Morgan, I believe, had his check made out to this engineer and the Eternit people told Mr. Morgan they would pay the engineer themselves. That is all I know about it.

"Q. This was some other engineer before Maurice Cassidy? A. Yes, sir; that is why I thought I would tell him to go up and see this other engineer and he could tell him where to get his check from.

"Recross Examination.

"Q. The place where you and he were when he came to ask you about the check, where was that? A. Inside of the building.

"Q. How close to the place where the accident occurred? A. About 250 foot, 200 foot.

"Q. Did any part of the duties that fell on Mr. Maurice Cassidy in his employment up there, take him to this crane from which he fell? A. I don't know nothing about that, only simply going up there to inquire about getting his check at twelve o'clock."

J. Paul, another hoisting engineer, was interrogated, in part, as follows:

"Direct Examination.

"Q. On July 9, 1927, were you working on this job where Mr. Cassidy was killed? A. I was.

"Q. Did you hear any conversation between him and Mr. Crews? A. Mr. Cassidy was just hoisting up a piece of iron, I believe, and I was on the air compressor for the Arthurs Ice Company. I was operating the air compressor and after Mr. Cassidy had been hoisting up this piece of iron he came over to the compressor and asked me who was going to pay him, so I told him I thought the Eternit people would pay him, and just about that time he asked Mr. Crews, and Mr. Crews told him to go up and ask the engineer up on the crane. That was just a short time before twelve o'clock and just a few minutes after that a young man came down to where I was at and said there was somebody up there all cut to pieces, so I .hurried up and here he was stretched out on the platform.

"Q. You are a hoisting engineer, too? A. Yes, sir.

"Q. Do you know who hoisting engineers work for on the job? A. Well, there is several subcontractors, some of the work is being done by contract and then some of it what we call time basis.

"Q. Why did you say the Eternit people would pay Cassidy? A. I am the steward on the job and it is up to any engineer that has any grievance to come and see me and I direct him to the best of my ability to get him straightened out.

"Q. Who did you say you were working for? A. Arthurs Ice Company.

"Q. What made you think the Eternit Company would pay Cassidy? A. Well, I was talking to a heavy hauler for the Morgan Company about two weeks ago about putting an engineer on this, I think it is Mr. Aker, or something like that, for the Eternit Company, was there, and he said he would take care of the engineers, so just a few days after that, why, he put on an engineer."

Robert J. Smith, Jr., a sheet metal apprentice, testified that, at about seven minutes to twelve, he heard Cassidy "holler" to Whitney, the operator of the overhead crane, and saw Whitney "motion" to Cassidy to come up, and saw Cassidy start up the ladder; and that he (Smith) then turned away, and, when he turned around, he discovered that Cassidy had fallen from the ladder.

Albert W. Whitney, operator of the overhead crane, gave the following testimony:

"Q. Did you have any conversation with Maurice Cassidy? A. At a quarter to twelve.

"Q. About a quarter to twelve? A. Yes, sir.

"Q. What did you say to him then? A. He hollered up to me and asked me where I got paid and I said that 'I don't know.' He asked me if they paid in cash or check, and I told him I don't know that. He said the steward sent him up to find out where he got paid, and I said that 'I don't know, I haven't got a pay check yet myself.' I hollered down to him and told him to wait for me until I came down and we would both go together. He asked me who I was working for and I told him the Eternit Company. He walked away, and looked at some of the pumps, and he came back again, I guess, at about seven minutes to twelve.

"Q. Twelve o'clock was quitting time, was it? A. Yes. He asked me if I wasn't going to take about five minutes time and shut off the crane and cover it up, and I said that I would if they got through with it. I saw the millwrights putting their things away and I traveled the crane over to the column. I shut the current off the wires and was covering up the controls with a piece of tar paper they had to keep the rain out of it when I heard an awful crash, and I turned around and I seen him with his right hand on the bottom wire and his left hand on the top rung of the ladder, and by the time I ran over to the side he had already let loose and was going down, and he was about twenty feet from the concrete and I turned my head—I did not want to see him hit—and I hurried up and got out of the cab and I hollered to the millwrights to get the man who fell off the ladder.

## "Cross-Examination.

"Q. After he came back from looking at the pumps you had no conversation with him and made no motion to him? A. No, sir.

"Q. You at no time asked him to come up on the crane with you? A. No.

"Q. And you at no time motioned him to come up on the crane with you? A. No, sir.

"Q. Did he have any business on the crane with you—in other words, any duty to perform with you up there? A. The only duties I saw he would have was to find out where he would get paid, being as I was working for the company.

"Q. But you had given him that information when you had the conversation with him before he went to look at the pumps? A. I told him I didn't know where we were to get paid—in what part of the building."

The Cassidy family consisted of Maurice J. Cassidy and Theresa C. Cassidy, father and mother, and the deceased Maurice J. Cassidy, Jr., a legally adopted son, then nineteen years and seven months of age, and Jean Catherine Cassidy, a legally adopted daughter, then ten years of age. The father was secretary of the Building Trades Counsel of St. Louis, and his salary for such services was $85 per week. In addition to his salary, he earned several hundred dollars per year writing articles for newspapers and magazines. He owned a vacant lot in St. Louis worth about $200. The mother owned the residence property in St. Louis, in which the family lived. The purchase price of this property was $12,000, and, allowing for all encumbrances, her equity therein was worth about $2,000 or $2,500. She also owned a flat in St. Louis worth $9,000, in which she had an equity of $7,000. She received rents from this flat in the sum of $110 per month. The deceased had not been emancipated. The mother managed the finances of the household. The father turned over to her all of his salary, of $85 per week, and $200 per year out of the money he earned writing articles for newspapers and magazines. The deceased, with the father's consent, turned over to his mother all of his earnings. Out of the fund so constituted, she paid all expenses of the houshold. She kept a separate account of the rents derived from her flat and used the same in liquidating the indebtedness on her real estate. The deceased had two automobiles which were purchased for him by his mother. She paid for the upkeep and operation of these automobiles out of the general household fund. The monthly upkeep and operating expenses of one of these automobiles, a new Nash, amounted to about $20. The other automobile was a Ford roadster which the deceased used in going to and from his work. The amount spent monthly for the upkeep and operation of the Ford roadster does not appear. She also furnished the deceased with food, lodging, clothing, and about one dollar per day for spending money, and paid the premiums on his life insurance policies, amounting to about $106 per year, out of the general household fund.

The judgment of the circuit court recites that on December 15, 1927, the Commission made the following findings and final award:

"That on July 9, 1927, at St. Louis, Missouri, Maurice J. Cassidy, Jr., died as the result of injuries sustained on said date in an accident when he came in contact with a highly electrically charged trolley wire of traveling crane, causing him to fall from a ladder; that, at the time, he was obtaining from a fellow-worker information as to payment of wages, as directed by foreman; that, at said time, he was in the employ of Eternit, Inc., and had been so employed for one and one-half days; that said accident arose out of and in the course of the employment, and that, before and at the time of said accident, the employer and employee had elected to accept the act;

that said deceased employee's average weekly wages were $66; that the said deceased employee was an unmarried and unemancipated minor, living with and under the custody and control of his parents, Maurice J. Cassidy and Theresa C. Cassidy, to whom he turned over all his wages, and who furnished him with maintenance and support; that said parents were total dependents of said deceased employee and are each entitled to half of the death benefits payable to total dependents; that compensation is due in the sum of $150 burial expenses, and death benefit of $20 per week for 660 weeks, or a total of $13,200; that the said Commission entered its award for compensation in favor of said Maurice J. Cassidy and Theresa C. Cassidy for $150 for burial expenses, and to Maurice J. Cassidy the said sum of $10 per week for 660 weeks, and to Theresa C. Cassidy the sum of $10 per week for 660 weeks, each of said payments to begin as of July 9, 1927.''

Appellants contend: First, that the evidence does not support the finding that Cassidy was in the employ of the Eternit Company; second, that, even though it be held that he was in the employ of the Eternit Company, the evidence does not support the finding that the accident (which resulted in his death) arose out of and in the course of his employment, within the meaning of the Compensation Act; third, that he was a ''casual'' employee, and, therefore, excluded from the protection of the Compensation Act; fourth, that the evidence does not support the finding that respondents were total dependents of deceased; and fifth, that the total death benefit of $13,200, awarded in this case, exceeds the amount authorized by the Compensation Act.

I. Appellants' first contention need not be considered at length. It will suffice to say that, in our opinion, the testimony of Crews, foreman of the Morgan Hauling Company; of Paul, a hoisting engineer and ''steward on the job;'' of Brice, representative of the Hoisting Engineers' Local, and of McCorkle, plant manager of the Eternit Company, is amply sufficient to support the finding that Cassidy was in the employ of the Eternit Company at the time of the accident which resulted in his death.

II. This brings us to the more serious question of whether or not the evidence warrants the finding that the accident arose out of and in the course of his employment.

Section 3 of the Compensation Act provides that—''If both employer and employee have elected to accept the provisions of this act, the employer shall be liable irrespective of negligence, to fur-

350

nish compensation under the provisions of this act for personal injury or death of the employee *by accident arising out of and in the course of his employment,* and shall be released from all other liability therefore whatsoever, whether to the employee or any other person." [Laws 1927, p. 492.] (Our italics.)

Section 7(c) says: "Without otherwise affecting either the meaning or interpretation of the abridged clause, 'personal injuries arising out of and in the course of such employment,' it is hereby declared not to cover workmen, *except while engaged in, or about premises where their duties are being performed, or where their services require their presence as a part of such services."* [Laws 1927, p. 496.] (Our italics.)

In construing Section 3, in the recent case of Wahlig v. Krenning-Schlapp Grocer Company et al., 325 Mo. 677, 29 S. W. (2d) 128, 130, we said: "An injury arises *'out of'* the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury; and an injury to an employee arises *'in the course of'* his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto." See, also Kiser on Workmen's Compensation Acts, secs. 64 and 72; 40 Cyc., following page 2880, and cases cited. Concerning Section 7(c), we said, in the Wahlig Case: "By declaring in Section 7(c) that injuries to employees arising *out of* and *in the course of* their employment, as provided for in Section 3, shall cover injuries to employees 'while engaged in, or about *the premises where* their duties are being performed, or *where* their services require their presence as a part of such services,' the Legislature, in our opinion, intended to extend the protection of the law to all employees while in or about *any premises where* they may be engaged in the performance of their duties, and while at *any place where* their services, or any act, task or mission which forms a necessary part of their services, may reasonably require them to be."

With this construction of Section 3 and Section 7(c) in mind, let us consider the evidence in this case. Crews, foreman of the Morgan Hauling Company, testified that he told Cassidy "to go up and see the other engineer on the other crane," but he did not testify that he told Cassidy to climb up to the cage of the crane. Paul, "the steward on the job," to whom Cassidy talked first concerning his (Cassidy's) pay check, and who heard the conversation between Crews and Cassidy, testified that Crews told Cassidy "to go up and ask the engineer up on the crane," but he did not testify that Crews told Cassidy to climb up to the cage of the crane. Whitney, operator of the crane, testified that Cassidy "said the *steward* (J. Paul) sent him up to find out where he got paid;"

that the conversation between him and Cassidy occurred "about a quarter to twelve" and while Cassidy was standing on the floor of the building under the crane; that he told Cassidy "to wait" until he came down and they "would go together" to inquire about their pay checks; that Cassidy "walked away and looked at some pumps and came back again at about seven minutes to twelve;" that he had no further conversation with Cassidy before Cassidy started up the ladder; that he did not ask Cassidy to come up to the cage of the crane, nor "motion" to Cassidy to come up to the cage of the crane; and that Cassidy had no duty to perform in connection with the operation of the crane. Smith, a sheet metal apprentice, testified that "at about seven minutes to twelve," he heard Cassidy "holler" to Whitney, but he did not know what Cassidy said to Whitney; that he saw Whitney "motion" to Cassidy to come up; and that he saw Cassidy start up the ladder in response to Whitney's signal. It thus appears that there is a conflict in the evidence as to whether Cassidy attempted to climb up to the cage of the crane for the purpose of talking to Whitney concerning his pay check and because he understood Crews to tell him to go up there for that purpose, or whether he tried to talk to Whitney from the floor of the building and attempted to climb up to the cage of the crane because Whitney "motioned" to him to come up, or whether he had previously talked to Whitney concerning his pay check from the floor of the building and voluntarily attempted to climb up to the cage of the crane merely to visit with Whitney until twelve o'clock or for some other purpose. That we may give respondents the benefit of the most favorable view of the evidence, let us assume that Cassidy understood Crews to tell him to go up to the cage of the crane, and that he was attempting to go up there to talk to Whitney about his pay check at the time he came in contact with an electric wire and fell from the ladder and was killed. Cassidy was employed by the Eternit Company. Crews was the foreman of the Morgan Hauling Company, an independent contractor. Cassidy was subject to the orders and directions of Crews in doing his work as operator of the air hoist on one of the Morgan Hauling Company's automobile trucks, but he was not under the general supervision of Crews, nor was Crews authorized to give him any orders or directions concerning his pay check. Indeed, Crews testified that he told Cassidy he "didn't know whether they brought the checks around or whether he (Cassidy) was supposed to line up at the office;" and he further testified that he had never been told by "anybody of the Eternit Company where to send men who might inquire where they would get their checks." Cassidy was entitled to pay for his work as an essential part of his contract of employ-ment, and had he been killed accidentally while on his way from

the place of his work to a place where he had been directed to go by his employer for the purpose of receiving his pay check, a different case would be presented. [See Hackley-Phelps-Bonnell Co. v. Industrial Commission, 165 Wis. 586.] But, the accident under consideration occurred at a place where he had gone not to receive his pay check but to get information concerning his pay check, at the instance of one who was not authorized to so direct him. And, while the accident occurred within the period of his employment, it did not occur at a place where his services required him to be, nor while he was performing any duty of his employment. Nor was there a causal connection between the conditions under which his work was required to be performed and the accident which resulted in his death. It follows that the evidence does not warrant the finding that the accident arose out of and in the course of his employment, within the meaning of the compensation act, and that the award of death benefits in this case cannot be permitted to stand. [See Kizer on Compensation Acts, sec. 73, and cases cited.]

This conclusion renders it unnecessary to consider the other questions raised by appellants, and, in accordance with this conclusion, the judgment is reversed. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.