MARY REED ET AL., RESPONDENTS, v. ARTHUR L. SENSENBAUGH ET AL., APPELLANTS.—86 S. W. (2d) 388.

Springfield Court of Appeals. October 7, 1935.

*Finch & Finch* for respondents.

*Blanton & Montgomery* for appellants.

BAILEY, J.—This proceeding originated before the Missouri Workmen's Compensation Commission on a claim for compensation. The claim filed substantially alleged that Mary Reed, as the widow, and Dorothy Reed, Dewel Reed and Darwin Reed, as the minor children, of one Connie Reed, were entitled to compensation against appellants Arthur L. Sensenbaugh and N. M. Sensenbaugh, doing business as "Sensenbaugh Brothers," because of the death of said Connie Reed while employed by them, which death is alleged to have arisen out of and in the course of his employment. This appeal is from the judgment of the Scott County Circuit Court, affirming a final award of the Workmen's Compensation Commission in favor of claimants and against Sensenbaugh Brothers, who were not insured, in the lump sum of $2,665.67.

At the hearing before the commission, held February 28, 1933, it was stipulated and agreed that Connie Reed was an employee of Sensenbaugh Brothers; that both parties were under the Missouri Compensation Law; that on December 13, 1932, the employee died as a result of injuries received in an accident, but it was denied that such accident arose out of and in the course of his employment. The referee before whom the original hearing was held found that the accident did arise out of and in the course of the employment; that the employee was a garage mechanic and came to his death by reason of a gun shot wound, and an award was made based upon an agreement as to the weekly wage, medical aid, etc.

The facts upon which the claim for compensation is based are substantially as follows: Connie Reed was a night mechanic employed by defendants. He was shot about two A. M. on December 13, 1932, while engaged in his employment at defendant's garage in Sikeston, Missouri, by one Louis Hunter. Reed was removed to a hospital and died about noon of the same day. The testimony further shows that Sikeston was headquarters for Troop E of the Missouri State Highway Patrol, in charge of Sergeant Rufus Reed; that on the night of the tragedy highway patrolman Turnball called Sergeant Reed by telephone from Fredericktown, advising him that a man, who afterward was learned to be Hunter, accompanied by a woman, had had an automobile accident near Fredericktown while travelling south over Highway 61, and that he had disobeyed instructions to report at Fredericktown for medical treatment, but had driven rapidly south in the direction of Sikeston, and requested that the driver of the car be intercepted for questioning. Reed thereupon called trooper Hubert Brooks, who happened to be at defendants' garage at the time, and ordered him to intercept Hunter and investigate him and his car. At defendants garage there also happened to be one Gid Daniels, the night marshal at Sikeston. These two officers, in obedience to the order, repaired to the intersection

of Highways 60 and 61, a short distance east of Sikeston, where they awaited Hunter. Shortly thereafter he arrived and stopped at a filling station at or near the intersection. He was accosted by the officers and, their suspicions being aroused, they ordered him to drive his car to defendants' garage, the officers following in their own car.

G. A. Daniels, the police officer of the City of Sikeston, who had accompanied Brooks, the highway patrolman, as aforesaid, testified in regard to what occurred after they arrived at the garage, as follows:

"When we got to the Sensenbaugh Garage the door was closed, but someone opened it, I cannot say for sure who did it, whether it was Reed (the deceased) or Camden, and the other car drove inside. I don't remember whether a horn was sounded or not before they drove in. When I got inside of the garage I saw Mr. Brooks and Mr. Reed and the two parties in the other car; that is where Mr. Reed was employed.

"When I got in Reed went to get something. I think it was a storage ticket, but I won't say for sure. The office is on the east side of the building. The garage faces the northwest and, as you drive in the office, where the storage ticket would be is on the left. There is a stove and telephone booth on the right. The other car was driven to the left of the stove and telephone booth about even with the stove. In getting the storage ticket Reed would go from the stove and telephone booth over across to the other side of the room. When I last saw Reed he was standing back next to Brooks over at my left.

"There was no conversation that I heard between Reed and the rest of us. The man that was in the car had gotten out when I entered the garage and was walking over toward the stove and when I got over even with the stove he said 'stick 'em up' and got a gun and went to shooting, and of course I throwed myself sideways to him and threw my arms over my face. Of course, he shot me down there.

"The next time I saw Reed he was going out the door a few minutes later. He had his hands up over his head and said, 'Mister, please don't shoot me any more,' and I saw him going out the door. That was after the shooting was over. I do not know what became of Brooks. He went out of the garage and did not come back until after the shooting was over. The man that drove the car there went out the back of the garage. He left after Brooks left. The woman remained in the car. . . .

"There was no other employee in the garage when I went in that night except Reed, at least if there was anybody else, I did **not**

see him. This garage is open all night for either mechanical service or storage.

" 'Q. Is it or is it not a custom for the officers and you and other officers here where they make arrests with motor vehicles to drive to Sensenbaughs' and store cars and—

" '(Objected to.)

" 'A. Well, I have taken lots of cars there and stored them.'

"Yes, sir, it is a custom. Every car I have recovered I have taken there for storage. Brown Jewell, the constable, also taken them there. I do not know about the highway patrolmen but when cars are taken there they usually give you a storage ticket to identify the car, on which is placed the license number of the car. The ticket is in duplicate, they keep one and give the party with the car the other."

On cross-examination the witness further testified:

"I think Mr. Reed went to get a storage ticket, but I couldn't say whether he ever used it. He did not hand it to me and I never saw him put it on the car.

" 'Q. Did you tell him you wanted a storage ticket, that you wanted to store a car? A. No, sir.

" 'Q. Did you ever hear anybody else say so? A. Well, I don't believe there was anything said at all.

" 'Q. Did he undertake to get any gas or oil at the pumps of that station? A. No, sir.

" 'Q. Did you hear anybody ask that the car be repaired? A. (No answer.)'

"In the past when I had taken cars over there to store them, I did not use the garage as a place of examining the prisoner; I merely took the car there. If I had any prisoners in those other cases, I would take him to jail and then take the car to the garage.

" 'Q. You never before had taken a prisoner in there? A. No, sir, I don't remember ever taking one in there.'

"It was an awful cold night with ice and snow on the ground and Mr. Brooks and I took the prisoner in there merely to get out of the weather. It was something like 2:15 or 2:30 in the morning when I intercepted them on the highway and it was not but a few minutes after he got in the garage before the shooting took place."

He further testified that no attempt was made by Hunter to rob the place; that sometimes the state troopers stored their cars in the Sensenbaugh Garage; that the State Patrol had its headquarters in the State Highway Building located near the intersection on Highway 61.

Brown Jewell, a constable, testified that he stored all cars in defendants' garage that were taken in by the officers which amounted in all to sixty or seventy over a long period of time; that other

officers did the same; that he had never taken prisoners there or used the garage as a police station.

On the part of defendants, Rufus R. Reed, sergeant of Troop E, testified that it was not customary for troopers to take persons arrested to the garage of defendants for questioning, but that the captain of the troop used the garage for storage of his car and sometimes to store recovered stolen cars there.

Mr. Brooks, the highway trooper who had taken Hunter into custody, testified in part, as follows:

"When I got back to the garage there was just one employee there and that was Connie Reed. I told him we were bringing in a car and he went over to get a storage ticket, but I don't think he got it partly filled out. I saw him lay it down. He closed the door after the car came in. I don't know whether it was before or after he had gotten the storage ticket that he closed the door. As I came in the door I said, 'We are bringing in a car to check over,' and he swung the door open and the door must have been closed when he went after the storage ticket. I told him we did not need a storage ticket, at which time he was back at the rear of the car. He then laid the storage ticket on the battery station railing, which was near the car, and the shooting started immediately. At the time the shooting started Connie was at the back of the car in a position to get the license number and everything. The back end of the car was six to eight feet from the railing where he laid the ticket and about this time this fellow pulled out the gun and went to shooting."

Re-direct examination by Mr. Blanton.

"He (Connie Reed) laid the card on the railing after I told him we wouldn't need a ticket.

" 'Q. Now, you boys don't make Sensenbaughs headquarters for the purpose of investigation, do you? A. No.

" 'Q. Have you got a headquarters for investigations at headquarters? A. Yes, sir.

" 'Q. You may state what your practice is in that respect. A. All the cars we got before were taken with the occupants to the office.

" 'Q. To what office? A. Our office in the Highway Building, and this night man, or janitor, leaves the Highway Building at two o'clock and the office was closed at the time we stopped this car; so then we took him to Sensenbaughs.

" 'Q. On account of the fact that the office was locked and the weather was cold? A. Yes, sir.

" 'Q. Had you taken any other prisoners there for investigations? A. No, sir.

" 'Q. So far as you know that is the first one you took there? A. Yes, sir.

" 'Q. Was Mr. Sensenbaugh there and did he know you were taking this one there? A. No, sir.' "

There was further testimony that Connie Reed, deceased, was a mechanic and had nothing to do with the storage of the cars except when no one else was there (which was true on the night in question). Harry Camden was in charge of the garage at night but at the time of the shooting was out getting a sandwich, contrary to defendants' instructions, leaving Connie Reed in charge.

N. M. Sensenbaugh, one of defendants, testified that he had not authorized Connie Reed to look after anything except the mechanical department; that he was not in charge of the storage, pumps, office or cash register, but that he expected all employees to cooperate with each other; that they did not insist on any employee following any given line of duty and doing nothing else; that they expected Harry Camden to stay on the job at night and look after the storage.

Defendants take the position that, conceding all the facts in evidence favorable to plaintiffs to be true, yet, as a matter of law, they are not entitled to recover. This contention is based upon the theory that the accident, as a result of which compensation is claimed, did not arise, "out of and in the course of" the employment, as provided by Section 3301, Revised Statutes, Missouri, 1929. Before discussing that question it is well to restate several thoroughly established legal principles.

A finding of the Workmen's Compensation Commission, that an accident arose out of and in the course of the employment, is a finding of fact and is as conclusive on this court or the circuit court as would be the verdict of a jury if supported by any substantial and competent evidence. [Sec. 3342, R. S. Mo. 1929; Bowen v. Hall-Baker Grain Co., 67 S. W. (2d) 536.]

The burden of proof rests upon plaintiffs to show both that the accident arose out of the course of the employment and in the course of his employment, which are, of course, two separate and distinct questions. Also, it is held, that a mere showing that an employee received injuries by accidental means at or near his regular place of employment and during working hours, standing alone, forms no basis for a presumption that the accident arose out of and in the course of the employment. [Lanahan v. Brick Co., 55 S. W. (2d) 327; Stone v. Blackmer, 27 S. W. (2d) 459, 224 Mo. App. 319.]

In other words, the Compensation Act does not afford accident insurance entitling the workman to compensation for an injury resulting from any and all accidents he might sustain, although he might at the time be engaged in his master's business. The accident must fall within the provisions of the act as heretofore set forth.

In this case there can be no doubt that Connie Reed died as the result of an accident and that the accident occurred at the place

where he was employed during his working hours. We also think there is no difficulty in finding substantial evidence to form a basis for the conclusion that the accident arose in the course of his employment. It is true, as stated by defendants in their brief, that at the time Connie Reed was shot he was attempting to perform a service which he was not specifically employed to do. He was a mechanic and as such would ordinarily not be expected to open the garage door, admit patrons and accept cars for storage, as he did on the night of the accident. But at the time he was the only employee of defendants there present. He would have been a poor servant indeed if he were so inconsiderate of his master's business as to refuse to admit cars under such circumstances. It is reasonable to suppose that in a small garage the different employees would be expected at times to perform various and sundry services which were not strictly a part of the work for which they were particularly fitted or hired. In fact one of defendants testified that they did not insist on an employee following any given line of duty and doing nothing else, and that he expected all employees to cooperate with each other. It is held generally that an injury to an employee arises "in the course of" his employment, "when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or doing something incidental thereto." [Wahlig v. Krenning-Schlapp Grocery Co., 29 S. W. (2d) 128, l. c. 130, 325 Mo. 677.]

The converse of that rule, as stated by defendants, is to the effect that where an employee is injured at a place on his employer's premises where his duties do not require him to be or is engaged in some activity forbidden by the rules of his employer, or in obeying someone who had no authority, the injury does not arise out of and in the course of the employment. [Kasper v. Foundry, 54 S. W. (2d) 1002; Cassidy v. Eternit, 32 S. W. (2d) 75; Probst v. St. Louis Basket Co., 52 S. W. (2d) 501.]

Of course there can be no definition of the terms under discussion which will meet all contingencies and circumstances. Each case, it is said, must stand upon its own particular state of facts, and the statute applying thereto should be liberally construed with a view to the public welfare. In the Kasper case (supra) it was held: "If the employee is injured in the doing of something outside the regular duties for which he is employed, but which is not wholly beyond and disassociated from his employment proper, and tends ultimately to react to the employer's benefit, then, absent any question of the effect of the violation of a positive order not to have done such an act, he is quite naturally to be held to have been injured by accident arising out of and in the course of his employment." To our minds it requires no liberal construction of the compensation

act to hold that under the evidence here the accident in question falls within the reasoning above set forth, in so far at least as having occurred within "the course of" the employment.

While an accident may arise "in the course of" the employment it does not follow, of course, that the resulting injury entitles the employee or his beneficiaries to compensation. Under the statute the accident must also "arise out of" the employment. In 28 R. C. L., sec. 91, pp. 801-802, it is said:

"It is commonly held that 'arising out of' does not mean the same thing as 'in the course of,' and that the legislature has imposed a double condition. The injury must not only arise 'in the course of' but also 'out of' the employment. Proof of the one without the other will not bring a case within the act. While an accident arising out of an employment almost necessarily occurs in the course of it, the converse does not follow. An injury which occurs in the course of the employment will ordinarily arise out of the employment. But not necessarily so. The expression applies to the employment as such—to its nature, its conditions, its obligations, and its incidents. It must appear that there is some causative connection between the injury and something peculiar to the employment. The nature of the occupation may supply causative relation. But it is only as to some employments that this is so. The court is directed to look at what has happened proximately, and not to search for causes or conditions lying behind as would be the case if negligence on the part of the employer had to be established."

The same general principles are followed by the Missouri courts. No attempt to define the phrase "arising out of" the employment has proven entirely satisfactory and the tendency appears to be not to limit or confine its scope except in catholic terms. In Meeting et ux. v. Lehr Construction Company, 32 S. W. 121, 1. c. 124, after setting forth a general definition of the provision under consideration, the appellate court quotes with approval from a Massachusetts case, as follows:

"An accident arises 'out of' the employment, when there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under the test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment.

"It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear

to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence. [In re Gould, 215 Mass. 480; 102 N. E. 693, Ann. Cas. 1914D, 372, and companion cases; In re McNicol, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306. See, also, Wahlig v. Grocer Co. (Mo.), 29 S. W. (2d) 128.]"

In the case of In re McNicol, above referred to, the Massachusetts court uses this language:

"An injury is received 'in the course of' the employment when it comes while the workman is doing the duty which he is employed to perform. It 'arises out of' the employment, when there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." [L. R. A. 1916, p. 307.]

We are cited numerous decisions by industrious counsel on both sides in this case, each contending that their respective theories are supported thereby. Any attempt to review those decisions would unduly prolong this opinion and would result in no material aid to either the litigants or the profession. The authorities cited above enunciate the law applicable in this case and the law as generally followed. Considering this case upon its own peculiar facts, it is not one in our opinion where the line of cases would be applicable which hold that, where an employee is wilfully killed because of a personal grievance or through malice or vindictiveness and from a cause wholly disconnected with his employment, no recovery can be had even though the employee was killed while engaged in the discharge of his duties. [Keithley v. Stone Co., 49 S. W. (2d) 296; January v. Schumaker, 22 S. W. 117, 231 Ky. 705; Coope v. Loew's Theatre, 215 App. Div. 259, 213 N. Y. 254; McConnell v. Lancaster Bros., 42 S. W. (2d) 206, 163 Tenn. 194; McDevitt v. Cab Co.,

136 Atl. 230, and many other cases cited by defendants.] An examination of those authorities will reveal that in each instance the party inflicting the injury was personally known to the employee and inflicted the injury through personal animosity arising over some cause wholly disconnected with the employer's business. In this case the personal equation did not enter. The deceased employee was not personally picked out as the object of Hunter's wrath. Reed had done nothing to provoke an assault. They were utter strangers to each other. It was merely that Reed's duty required him to be there present and had he not been there he would not have been killed.

Defendants cite many authorities in support of the proposition that, ''Where injury or death is the result of a hazard unconnected with the prosecution of the work in hand, or where it is the result of risks to which all persons similarly situated are equally exposed, whether in employment or not, and not traceable in some special degree to the particular employment, it does not arise out of the employment.''

Among the authorities cited are the following: Stone v. Blackmer & Post, 27 S. W. (2d) l. c. 460, Par. 406, 224 Mo. App. 319; Kizer on Workmen's Comp., Par. 67d, page 77, note 97; Conaway v. Marine Oil Co., 110 So. 181, 162 La. 147; Bull v. Way Co. Corp., 229 N. W. 597, 250 Mich. 51; Spiller v. Ind. Comm., 163 N. E. 624, 322 Ill. 586; Hendrix v. Bert, 290 S. W. 30, 154 Tenn. 287; In re McNicol, 215 Mass. 497, 102 N. E. 696, 697; Porter v. City of New Haven, 135 Atl. 293, 105 Conn. 394; Md. Cas. Co. v. Peck, 137 S. W. 121; Slanina v. Ind. Comm., 117 Ohio St. 329, 158 N. E. 829, 831.''

For the most part those are cases involving, ''An Act of God,'' street accidents, storms, robbery on streets, etc. In the case at bar we must consider the nature of the work in which Reed was employed. He was on night duty in a public garage where his duties required him to come in contact with people generally, at all hours of the night. It was his duty to open the doors to any and all prospective patrons when summoned to do so. The nature of the business carried on by defendants subjected Reed to hazards not common to the general public. The officers who brought Hunter and his car into the garage on the fatal night of the tragedy, were frequenters and even patrons of the garage. This must have been known to Reed, who had been there employed for some time. He believed they were bringing in a car for storage and came forward with a storage ticket. The fact that the ticket was not used we do not consider controlling. He had every reason to believe it would be used and had the officers' investigation proven that the car was stolen, which it was, the car, in accordance with past experience, would have been stored. The court will take judicial knowledge of the fact that em-

ployment in an all night garage in a community where other businesses are generally closed, is apt to be peculiarly dangerous. It is a hazard connected with the employment. The cause of the death of Connie Reed may be attributed to such hazard and to the "*locus in quo* that necessarily exposed him to injury," as was said in the January case, supra. In other words it is our opinion that in this case there was sufficient competent evidence to support the finding of the commission and to show that there was a causal connection between the injury and the conditions and circumstances under which the deceased employee worked. For the reasons stated the judgment should be affirmed. It is so ordered. *Allen, P. J.*, and *Smith, J.*, concur.