FRANK E. BOWEN, RESPONDENT, v. HALL-BAKER GRAIN CO. ET AL., APPELLANTS.—67 S. W. (2d) 536.

Kansas City Court of Appeals.   December 4, 1933.

*C. H. Ewald* for respondent.

*Morrison, Nugent, Wylder & Berger* and *Douglas Stripp* for appellant.

TRIMBLE, J.—The case herein is under the Workmen's Compensation Act. Claimant, and now respondent, Bowen, for about eighteen months, and possibly three and one-half years, prior and up to March 15, 1932 (the date of his injury), was an employee of the Hall-Baker Grain Company in its elevator at North Kansas City, Clay County, Missouri, and the Great American Indemnity Company was its insurer. Bowen, on July 7, 1932, filed claim for injury caused by coming in contact with an electric current. Answer thereto was duly filed denying that the injury arose out of and in the course of his employment, and the claim was heard before Commissioner Shaw on July 27, 1932, and on September 30, 1932, a temporary or partial award was made in claimant's favor, which, upon a hearing by the full commission, January 13, 1933, was made permanent, and claimant was awarded compensation in the sum of $2,933.25 (consisting of $53.25 value of medical aid not furnished, and compensation for 150 weeks at $19.20 per week, amounting to $2,880). From this award by the commission, an appeal was duly taken to the circuit court where, on March 20, 1933, the award of the commission was affirmed. From this, the employer and insurer have appealed.

The only point involved in, and contention made by, their appeal is that "there is not sufficient competent evidence" (which we interpret as meaning no substantial competent evidence) to show that the accident "arose out of and in the course of" the claimant's employment. We do not understand that appellants raise any point against the *amount* of the award, or against *how* the commission ar-

rived at the amount thereof, but only that it had no evidential basis on which to make any award at all in claimant's favor. Hence we need not consider Point II in respondent's brief in support of the method the commission used in reaching that amount or the correctness thereof.

With regard to appellants' sole contention above mentioned, it is, of course, well settled that the commission is the sole judge of the truth of the evidence and of its weight; and its finding that the accident did arise out of and in the course of claimant's employment is binding upon this court, if there is in the record any substantial competent evidence which, together with all reasonable inferences deducible therefrom, will support the finding and making of such award. [Sec. 3342, R. S. 1929, 12 Mo. St. Ann., Sec. 3342, p. 8275.] The Compensation Commission's finding in this regard is conclusive if supported by sufficient competent evidence, and in considering the question whether the award is supported by the evidence, we consider only evidence most favorable to claimant (together with all reasonable inferences which may be drawn therefrom), to support the conclusion of the commission, and disregard any unfavorable evidence contradictory of such favorable evidence supporting the award. [Probst v. St. Louis Basket, etc., Co., 52 S. W. (2d) 501.] The finding that claimant's injury arose out of and in the course of his employment is a finding of fact and not a conclusion of law, and is conclusive if supported by any substantial evidence; and whether there is any substantial, competent, supporting evidence in a case is to be decided upon its own particular facts and circumstances. Leilich v. Chevrolet Motor Co., 40 S. W. (2d) 601, 605; Sawtelle v. Stern Bros. & Co., 44 S. W. (2d) 264, 269, which last-cited case also holds, as do others, that "The Workmen's Compensation Law must be fairly, reasonably and liberally construed in order to effectuate the legislative intent to afford compensation to an injured employee rather than strictly and technically construed in order to deny compensation." [See also Carrigan v. Western Radio Co., 44 S. W. (2d) 245; Keithley v. Stone & Webster, etc., Corporation, 49 S. W. (2d) 296; all of which are based, no doubt, on Section 3374, R. S. 1909, 12 Mo. St. Ann., Sec. 3374, p. 8293.]

As to what are the facts, circumstances and reasonable inferences to be drawn therefrom, the record discloses the following:

Employee's primary duty was that of a "belt man," i. e., to look after and attend conveyor belts from three to four feet wide, running perhaps twelve miles per hour by electrical power, in tunnels and basement, loaded with grain and carrying same to the various places, the spouts and into car loading, the belts being operated at about knee height. In addition to his belt duties, when not attending to them, he had other duties. As he himself testified, after telling of his work with reference to the belts, "first floor my duty (was) to

help in there or any other work I was told to do, my work didn't consist entirely down in tunnels or in basement, mixture of work— whatever I was told to do." When asked if he had any other duties beside those of belt man, he replied, "Yes, lots of different work, help run cleaner and switch around and maybe feed it in or go upstairs to help out or read temperatures or tanks, different things wherever they sent me." The evidence discloses that he had also duties of sweeping in various places around the head house, to sweep and clean up around the elevator plant or anything he might see fit to do. Mr. Neeley, the man immediately over claimant in authority, testified thus concerning his duties other than those of belt man: "Well, after he finished loading, his duties were to come up on the work floor and help sweep in all around the legs we were using where wheat leaked out; after he got that done, if he had his work done in the basement, why he *was to work any place he seen fit* and anywhere we needed him." Mr. Neeley also testified concerning respondent Bowen, "We didn't have to send him every place, we might not have anything special for him to do for a while and we told him, clean up and *wherever it needed it and wherever he found the dirt,* that's where you (would) find him." And the general superintendent, Mr. Riley, asked as to the kind of an employee Bowen was, replied, "He was a perfect workman."

Shortly before eleven o'clock in the forenoon of the day of the accident, Bowen had "finished loading out" wheat (by means of the belt conveyors). The accident occurred "somewhere around eleven," and "about five minutes" before the accident, he was seen "sweeping about a third of the way of the house on the south end of the work floor . . . That was part of his work." There were several, perhaps two other men, "sweeping that same stuff" at that time and there was a little more sweeping to be done but it was almost or practically done. Witness did not see Bowen quit sweeping nor miss him until he heard him "holler" and he (Bowen) was being carried off injured when next he saw him.

Within a few minutes after he was last seen sweeping on the work floor of the main elevator building, he was found lying, unconscious, on the ground just outside the "dryer house," in the corridor between the dryer and the main elevator building, on his back with his head to the east and his feet to the west (another witness said, "his head was lying down north and south or his head toward the east of south. His feet was north his feet was south.") The place where he was found was about 150 feet (counting the way he would have to go to get there) from the point where he was last seen sweeping. It was quite cold when he was working and he wore gloves, though it is not clear whether his gloves were on his hands when he was found or not. At any rate, his right leg was broken and both his hands had very severe electrical burns on them causing a thirty per.cent loss of

use in the left hand and a forty-five loss of use in the right, but no permanent disability by reason of the broken leg.

Claimant-employee was from the first unable to recall or remember anything that occurred between the time he shut off the machine operating the conveyor belts (about fifteen minutes before the injury) and the time he regained consciousness in the hospital in Kansas City to which he was taken as soon as possible after he was found injured and unconscious at a point near to a platform about eight feet, seven inches above the ground reached by a ladder leading up to it, which platform gave access to the "motor room" in which was the motor used in operating the machinery in said "dryer house." Indeed, the injury resulted in such loss of memory that he does not even remember the sweeping the other witnesses say he did, but he thinks he must have shut off the power when the sweeping was nearly done as that was his duty and he always shut it off then, and the evidence shows that the power was off and the machinery not running when he was found. The point where he was found lying on the ground was near to and below one side of the platform where he would naturally be if he fell from the platform.

Is there substantial evidence, including reasonable inferences, to support the commission's finding?

Before attempting to discuss or analyze the evidence as to its bearing on this point, it may be well to state that appellants' record is in an unsatisfactory condition so far as clearness and definiteness in showing certain facts are concerned, and even after repeated reading and much study, it is difficult to clearly understand or explain. For instance, there were four photographs introduced in evidence by appellants. The first (Exhibit 1) was offered and the witness was asked, "tell us if you recognize what that is?" "A. That shows the southeast corner of the main elevator building and the northeast corner of the grain dryer—the southeast corner of main elevator and southeast corner—southeast of elevator and northeast of the grain dryer." "Q. What's this, that grass? A. That's grass, that's a yard —this hall-way—or whatever you want to call it—go up there and turn around the corner of the building and door to this dryer be about as opposite this point." But, as in the photograph, there did not appear to be more than one building, or, if two, they did not appear to be separate, and, as only a portion of said buildings, if there were two, was shown and nothing to show directions on the photograph, the answers are not intelligible to one wholly unacquainted with the premises. If the questioner were holding the photograph up to plain view and pointing with his finger to various places on the picture, it would be easily understood by all present when references were made to "this" and "that" and "up there" and "turn around corner of the building and door to this dryer, be about as opposite this point," but certainly not understandable to one knowing nothing of the prem-

ises and endeavoring to understand it by reading the printed page and comparing it with the unexplained and, of itself inexplicable, photograph. The same is true of the photograph (Exhibit 2) showing a small portion of each two buildings with a narrow passageway between them, leading in an unknown direction to the outdoors; turning to the beholder's right at the corner in the foreground and the bottom of a ladder leading upward out of sight, with debris and certain plank on the ground. Here again, the explanation of the picture is equally unenlightening. No directions are given or shown on the photograph. The witness says, ''This shows the south wall of the main elevator—of the elevator building and the northwest corner of the dryer building, *this* doesn't show corner of building, *this* shows the side wall. Q. What's this space in between these two buildings? A. Just an alleyway to come around in the door here. Q. A door? A. Right in here.''

Now, doubtless, the above is intelligible as to the ''alleyway'' but since there are two buildings only partly shown in the picture and no directions given, which can we say is the south wall of the main elevator; or which building is the dryer building and which the main building; and since the picture does not show a door, it explains nothing to us to have the witness say the alley is to ''come in the door here'' or ''right in here.''

Then, as to Exhibit 3, reference is made to ''this gate'' (which is either a fence or gate) and to ''this space'' and perhaps other points, most of which are equally unintelligible, except to persons participating in the hearing and seeing the places to which either the examiner or the witness is pointing. It is needless to pursue this subject further, except to say the photograph No. 4 is explained, or rather sought to be explained, in the same way, and testimony in which reference is had to the photographs is often obscure and not understandable for the same reason. The Compensation Commission, being present, could no doubt understand it all, but it should be remembered that upon an appeal, where the question is like the one here involved, care should be taken to see that the evidence is given so as to be intelligible to those of the appellate tribunal. These remarks are made, neither in sorrow nor in anger nor even in criticism, but solely to call attention to this which often has been overlooked, and in the hope that it will be avoided in the future. Besides, since the finding of the commission must be affirmed if there is *any* substantial evidence to uphold it, how can the appellate authority declare with any degree of confidence that there is *no* such supporting evidence, when it is manifest from the record that the commission was in a far better position to know and comprehend the evidence and its meaning and the inferences to be reasonably drawn therefrom, than anyone else? [Strother v. Chicago, B. & Q. R. Co., 188 S. W. 1102, 1103.]

We might, perhaps, base our affirmance of the case solely upon this point; but we are loath to do so if the evidence otherwise is sufficient to lead us to the same result, and we think it is, in this particular case.

It must be borne in mind that no one saw the claimant-employee's injury, or knew from whence it came, except that he was electrically burned very severely indeed in each hand, and apparently had fallen from the platform eight feet, seven inches from the ground reached by the ladder leading from the corridor or passway in which he lay when found. This platform appears to be five feet long, three feet wide and with a guard-rail or fence along its outside edge which is three feet high. This platform was immediately in front of a wooden door but framed or bound in iron, leading into the motor room furnishing the motive power used in the dryer room.

An effort was made to show that on this particular day claimant had not been ordered to go up to and on this platform and hence he was not where he had a right to be or where his work called him; but there was ample evidence that he was expected to clean this platform and motor-room whenever they needed cleaning; and this he did without specific orders to do so. So that the commission could well find that he was on the platform in the prosecution of his work, which he would be doing even if he went up there to see if cleaning was needed, though he did no actual cleaning because he found that none was needed up there. As to this feature, the superintendent testified, when asked if he knew of any duties of claimant in the enclosure where the platform was:

"Q. Know of any (duties) down in the enclosure? A. Well, no, be possible got cleaned up on work floor and decided to go around and see if the door needed cleaning up, *does that very often without any orders.*

"Q. In cleaning up door go through bottom door? A. Steps on outside.

"Q. You can't get up on platform from steps on inside, can you? A. No, sir.

"Q. That motor is reachable only from that platform? A. That's all."

At the further end of the platform from the ladder-access was a solid metal screen commencing at about the shoulders of a man standing upon the guard-rail or fence mentioned above and extending down to and even with the platform floor. At a point on this screen, about even with a man's head if he were standing on the platform, was a printed warning "Danger 13000 volts." Another sign on the wire gate or fence across the corridor in which were the ladder and platform and on which was the above-mentioned screen, bore the words "Danger High Voltage." The evidence is that the current was 13000 volts which the transformers reduced to 400 volts. Just above and

beyond the solid metal screen above mentioned were some of the transformers, the rest of them being outside of and nearer the bottom of said screen.

It is the *theory* (and we use the word advisedly), of the appellants that Bowen, the injured employee, laid aside his work, went up the ladder to the platform and stood upon the guard-rail or fence along the edge of the platform very near to the solid metal screen, took hold of the top thereof and either leaned over or reached over the screen, in the search for squabs in the nests of pigeons that lived and roosted about the plant, and that in this attempt he came in contact with the deadly wires at that place, received a terrific shock and the burns and fell from the platform to the ground where he was found.

But no one saw him do this. In photograph No. 4 they have taken a picture of a man the size of claimant, standing on this platform guard-rail or fence with his right hand on top of the solid screen and his left arm and hand raised and extended as if about to reach over to where the high voltage current and some of the transformers were. The superintendent, being examined with reference to the photograph of the man standing on the guard-rail, was asked:

"Q. What's (he) got his hand on? A. *Presumably* that's the position Bowen *was to have got his burns.*

"Q. Couldn't he have got them from gate? A. What gate?

"Q. This fence. A. No, see barbed wire—screen there and this is screen—*all presumptions. I absolutely don't know; all presumptions.*

"Q. Nobody saw the man? A. No.

"Q. When did (you) see him, on the ground? A. *Absolutely all presumptions.*"

Later on, his examination continued as follows:

"Q. Now, what is this shield here, what's the purpose of that? A. Well, I don't know exactly what the purpose is, always been there, it's high voltage coming into that transformer yard and put there as a shield, always been there since yard been there as far as I know, sir.

"Q. And would that shield—if you touched the shield wouldn't shock you? A. No, sir, it's grounded.

"Q. These collars if you touched them, give you a shock? A. Oh, yes, that's 13,000 volts coming there.

"By MR. STRIPP: I am not touching it, it looks like it. A. He is about twenty inches from it.

"By MR. SHAW: How far a man have to reach over from this shield in order to get over there? A. I would say about eighteen or twenty inches."

It is clear from all the foregoing testimony that, so far from the commission's conclusion being founded solely on guess and conjecture, the appellants' contention or theory that claimant was reaching or trying to get over the screen to secure squabs, is based on guess and

conjecture. It further shows or raises a reasonable inference that, as claimant was required to clean up wherever any cleaning was necessary, without regard to whether he was specifically directed to do so or not, and he could use his own good judgment as to what cleaning he should do and where, taken in connection with the conceded fine record he had as a faithful employee attentive to duty without being told or superintended, justified the trial court in affirming the order of the commission. In addition to all this, there is evidence that the electrical apparatus, conductors, transformers or arresters (whatever their technical name) were perhaps eighteen inches out from and twelve or fifteen inches below the top of the screen above mentioned; also evidence that it was impossible for a person of claimant's height to reach over more than six inches; that other evidence showed no pigeons were ever found at that place, so there would seem to be no occasion or reason to reach over the screen in such a quest. The evidence was that many of the employees obtained squabs at other places where the pigeons nested, but they did this by getting ladders and climbing up to where they were, not by going from this platform, though perhaps the birds could be seen, if one stood on the platform guard-rail and looked across at a certain point on the right to the place under the roof where the nests were. There was also evidence that claimant-employee was fully aware of the danger of reaching over or perhaps of touching the screen, for when asked about reaching over it, he said, "I say I wouldn't, I am not that crazy." When asked about trying to reach over the metal sheeting (or screen) to catch squabs he said no one would do so, "not unless you was looking for a shock, you wouldn't catch any squabs there, has been some on this under sheeting here, I never got any there because I didn't know how to get them."

There is no claim nor evidence to show that claimant's loss of memory is a *pretense* to avoid giving testimony as to how his injury occurred. For evidential purposes, therefore, the case is the same as if the employee had been dead when found, with no one present to see or tell how it occurred. He was known to be at work sweeping just a moment, or at the most only a few moments, before he was heard groaning, moaning and calling for help within the enclosed plant and at a place where he may well have been in the performance of his duty to see *whether sweeping was needed,* in which case he would be in the course of his employment whether he did, or was doing, any actual sweeping at that particular place or not. Under all these circumstances and in the absence of anything, except theory, guess or conjecture, as to *how* this mysterious, strangely-and-instantaneously-acting and powerful force of electricity, produced the injury, we are justified in affirming the judgment of the trial court who refused to say that the commission had no substantial evidence on which to base its finding. [Wahlig v. Krenning-Schlapp Grocer Co., 325 Mo. 677,

684, 29 S. W. (2d) 128, 131; Griffin v. Anderson Motor Service Co., 59 S. W. (2d) 805, 808; Zimmerman v. Goodfellow Lumber Co., 56 S. W. (2d) 608, 611.] It will not do to say, *as a matter of law*, that it is physically impossible for a current of 13000 volts of electricity to produce disastrous consequences to a human being except in a certain particular, well-known and prescribed way, i. e., by coming into direct, physical contact with a wire or wires carrying such current, which the court would in effect be doing were it to hold that *conclusively* the injury occurred in the way appellant claims it did. As said in Laudwig v. Central Missouri Power, etc., Co., 24 S. W. (2d) 625, l. c. 628, "as electricity remains a mystery and very little is known of its nature, we are unable to judicially notice either physically or scientifically that electricity will not jump a space of from five to eight feet through the air without material contact," citing Dunn v. Cavanaugh, 185 Fed. 451; Pennsylvania Utilities Co. v. Brooks, 229 Fed. 93, and Hoppe v. Winona, 113 Minn. 252.

Appellants cite a number of authorities in which the facts seem to make the cases dealt with very similar to the one at bar; but a careful examination of them reveals that each case has at least one fact or more which differentiates it from the case at bar, and hence said cases are not deemed to be in point.

The judgment is affirmed. *Shain, P. J.*, and *Bland, J.*, concur.