GRACE PEARCE, WIDOW, MARY MARGARET PEARCE AND BERNICE PEARCE, DAUGHTERS, DEPENDENTS OF IRA PEARCE, EMPLOYEE, RESPONDENT, v. MODERN SAND AND GRAVEL COMPANY, A CORPORATION, EMPLOYER, APPELLANT.—99 S. W. (2d) 850.

St. Louis Court of Appeals. Opinion filed November 10, 1936.

Motion for Rehearing Overruled December 8, 1936.

*Eliot, Blayney & Bedal* for appellant.

824

*Altman, Bremser & Scannell* and *E. C. Friedewald* for dependents.

HOSTETTER, P. J.—This is an appeal from a judgment of the Circuit Court of Franklin County affirming an award of the Missouri Workmen's Compensation Commission of $150 for burial expenses, and death benefits of $16.67 per week for three hundred weeks payable to Grace Pearce, widow of Ira Pearce, but conditioned that if Grace Pearce dies or remarries prior to the time said award is paid, then the remainder to be paid to Margaret Pearce and Bernice Rhodes, daughters and dependents of Ira Pearce, employee, in equal shares.

Ira Pearce is referred to by witnesses in their testimony as "Dick" Pearce.

The alleged accident, which resulted in the fatal shooting of Ira Pearce, occurred on October 14, 1933, while deceased was in the employ as foreman of the Modern Sand & Gravel Company, a corporation, employer and appellant.

Under the provisions of Section 3323, Revised Statutes Mo. 1929, the award was commuted and ordered paid immediately in a lump sum inasmuch as the Sand & Gravel Company had not insured its liability.

The claim for compensation set out that the accident occurred on October 14, 1933, as follows: "15. Employee was foreman and was killed by an employee in defense of employer's business."

The answer to the claim admitted that Ira Pearce was in the employ of the Modern Sand & Gravel Company at its plant at Pacific, Missouri, on October 14, 1933, and stated as follows:

"Employer denies all statements made by claimant under question 15 of the claim for compensation; denies that employee was killed by another employee and denies that accident arose out of the employment. Employer states that employee was killed in a personal quarrel having no relationship whatsoever to the employment."

At the hearing before the Commission testimony was offered which

developed that deceased Ira Pearce had been employed by the Sand & Gravel Company since January, 1933, and for the last seven months prior to his death had been the foreman in charge of the operation of the plant at Pacific, Missouri, at an average weekly wage of $25; that on October 14, 1933, Pearce was shot and killed by George Broyles on the Sand & Gravel Company's premises; that a few weeks prior to the killing George Broyles, who had been in the employ of the company, at a wage of fifty cents an hour, quit the services of the company.

There was testimony to the effect that when deceased was made foreman of the plant that Broyles resented that and complained of putting a man in as foreman over him and and another man who had been in the employ of the company much longer.

There was other testimony to the effect that Broyles held Pearce responsible, at least in part, for his not getting sufficient work at fifty cents an hour to properly support his family, and that Pearce conferred with Mr. Stiers, the president of the Sand & Gravel Company, about Broyles' complaint, and the president thought they might move him to some work in the mines at Illinois.

There was also testimony to the effect that Broyles was dissatisfied with working conditions and quit his job about three or four weeks prior to the time he killed Pearce. Broyles gave as a reason for quitting that he did not get enough work at the plant and that he had been there too long and wanted to make a change; that he thought he would operate a farm and could make more money at that than operating a dragline.

There was a six room house on the premises at the plant and Broyles and his wife occupied two rooms; Pearce occupied two rooms as an office and sleeping quarters when he spent the night at the plant, and his two rooms were also occupied by Melvin Martin, another employee; and the other two rooms were occupied by President Stiers whenever he came to the plant.

Pearce lived in St. Louis and frequently would go home on week ends and sometimes during the week to spend the night. Melvin Martin, who shared Pearce's two rooms at the plant, also lived in St. Louis.

Testimony was given by Grace Pearce, widow, that in June or July, preceding Pearce's death she heard Pearce tell Stiers that Broyles had told him that he (Broyles) was a $10 a day man and not a fifty cents an hour man and that he was not getting any repair work to do and that in a subsequent conversation she heard Pearce ask Stiers if Broyles had been in and asked for more money and that Stiers answered, "No," and that he would prefer that Pearce would handle the matter of Broyles' complaint, as he was afraid Broyles would cut the cables or set fire to the plant.

A few days after Broyles had quit the employ of the company he returned and engaged in a fight with Pearce, which was witnessed by other employees and who testified that Broyles, who had a knife, told them to stay there that he was going to make Pearce talk as he (Pearce) had insulted his wife.

Melvin Martin, an employee who saw the fight, testified that Broyles accused of Pearce of trying to break up his home and said, ''You fooled around until you got my job. If it hadn't been for you I'd been here yet working,'' and that then the fight began.

Martin further testified that after the fight Broyles said to him, ''You come here, I'm going to give you some of it, too, I'm no St. Louis gangster, I'm here by myself and I'm going to give you some,'' and that when Tom Broyles, his brother, tried to take him away, he said, ''Those St. Louis gangsters are not going to come and run this place.''

Pearce reported to Stiers, the president, concerning the fight and that Broyles had accused him of having improper relations with his wife and Stiers told him to go on back on the job that Broyles had had his revenge and would not return from his farm ninety miles away to continue the trouble.

After the fight Pearce never stayed at the plant at night, but went to his home in St. Louis and came back the next morning, sometimes coming out and going in with his wife, who frequently visited the plant.

Mrs. Pearce further testified that she had an interview with Stiers following her husband's death, concerning Pearce's relations with Broyles' wife and Stiers told her there was nothing to it, that he and Dick were very close and if it had been true Dick would have told him.

On October 14, 1933, about two weeks after the fight, Broyles returned to the plant and saw Pearce, who was talking with Mr. Robards, a salesman, and Broyles walked over towards them and drawing his pistol said: ''You see I have the gun cocked,'' and Pearce begged him to put it down as he would be sorry if anything would happen, saying, ''If anything would happen to me what about my family?'' and Broyles answered, ''You ruint may family,'' and Broyles asked Pearce if he had anything to do with doping his wife with chewing gum and Pearce denied it, then Broyles asked Pearce, ''What about the time you paid me fifty cents an hour to go into town when you had a man to do that who was working for twenty-five cents an hour?'' and Pearce denied that; that then Broyles further abused and cursed him and forced him to expose his person and Broyles looked and said, ''You diseased s—— of a b——,'' and shot him, with fatal results.

There was no testimony in the record which tended to support

Broyles' charge of improper relations between Pearce and his (Broyles) wife. There was much testimony to the effect that Broyles generally was very jealous of his wife and that from the place where he worked on the hoister he was in plain view of the rooms he and his wife occupied and nobody could get in without his knowing it; that often he would take her out in the car and leave her in the car and forbid her to look at any man. He was also prone to get drunk and was drunk on the occasions when he had these outbreaks. There was also testimony tending to show that Broyles was antagonistic to Pearce long before he ever brought up the charge of Pearce insulting his wife.

The testimony further showed that Broyles on several occasions made trips to St. Louis to discuss with Stiers, the president, the actions of Pearce in the operation of the plant and criticised them and tried to get the president to change the operations to suit his (Broyles') idea, and also to the effect that he did not approve of Pearce's management of the plant and would blame Pearce for failure to get sufficient work to enable him (Broyles) to properly support his family and that Pearce gave the repair work to common laborers.

Stiers testified that Broyles sough him to know if he (Broyles) could not be removed to a coal mine they were opening in Illinois, as he was an old Monighan operator, and that he told Broyles that he would give him preference as he was an old employee, but that they preferred to keep him at the gravel plant. Other testimony showed that Stiers and Pearce talked of sending him to the mine because of his dissatisfaction at the gravel plant.

After hearing all the testimony the Workmen's Compensation Commission, in finding that the testimony showed a compensable case, used the following language:

"We find from the evidence that the death of employee was the result of employee's working condition rather than any personal relationship between employee and Mrs. Broyles. We find, therefore, that the accident arose 'out of' and 'in the course of' his employment and his dependents are entitled to compensation as heretofore set out in this award."

The sole question involved in this appeal is whether or not there was substantial, competent testimony to support the finding of the Commission that the accident arose "out of" and "in the course of" Pearce's employment.

It is well settled law that the finding of the Workmen's Compensation Commission that the accident arose out of and in the course of employment is a finding of fact, which is conclusive on the Circuit Court and on this court, as would be the verdict of the jury if supported by competent and substantial testimony. [Section 3301, R. S.

Mo. 1929 (Mo. Stat. Ann., Sec. 3301, p. 8232), Section 3342, R. S. Mo. 1929 (Mo. Stat. Ann., Sec. 3342, p. 8275); Reed v. Sensenbaugh, 229 Mo. App. 883, 86 S. W. (2d) 388; Bowen v. Hall-Baker Grain Co., 228 Mo. 332, 67 S. W. (2d) 536; Goebel v. Missouri Candy Co., 227 Mo. App. 112, 50 S. W. (2d) 741; Noto v. Hemp & Co. (Mo. App.), 83 S. W. (2d) 136, loc. cit. 137; Borghoff v. Walter Freund Bread Co. (Mo. App.), 93 S. W. (2d) 1032.]

It is well settled, also, that in determining whether or not the award made by the Workmen's Compensation Commission is warranted by the testimony on appeal a court considers only testimony most favorable to support the award, together with all reasonable inferences to be drawn therefrom. [Cottingham v. General Material Co. (Mo. App.), 50 S. W. (2d) 661; Kizak v. Medart Company (Mo. App.), 93 S. W. (2d) 65, loc. cit. 66; King v. Mark Twain Hotel (Mo. App.), 60 S. W. (2d) 675, loc. cit. 677.]

If the assault, which resulted in the death of employee Ira Pearce, grew solely out of jealousy on the part of Broyles on account of his alleged misconduct with Broyles' wife, it is apparent that compensation to deceased's dependents should be denied. But, if the assault arose out of and in the course of the employment as a result of the peculiar nature of the employment and the particular work employee Pearce was engaged to do, then compensation should be awarded. [Cranney's Case, 232 Mass. 149; Harnett v. Steen Co., 216 N. Y. 101; Verschleiser v. Jos. Stern & Son, 128 N. E. 126; McNichol's Case, 215 Mass. 497; Martin v. Chase, 194 Iowa, 407, 189 N. W. 958; Sprang v. Broadway Brewing. & Malt Co., 169 N. Y. Supp. 574; Stark v. Wilson, 114 Kan. 459, 219 P. 507; Reithel's Case, 222 Mass. 163, 109 N. E. 951; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601; Teague v. Laclede Christy Clay Products Co., 331 Mo. 147, 52 S. W. (2d) 880; Gilmore v. Ring Construction Co., 227 Mo. App. 1217, 61 S. W. (2d) 764; Keithley v. Stone & Webster Engineering Corp., 226 Mo. App. 1122, 49 S. W. (2d) 296; Jackson v. Euclid-Pine Investment Co., 223 Mo. App. 805, 22 S. W. (2d) 849; Reed v. Sensenbaugh, 229 Mo. App. 883, 86 S. W. (2d) 388.]

In Jackson v. Euclid-Pine Investment Co., *supra*, this court made the following comments in respect to the definition of the two phrases "out of" and "in the course of," viz:

"Following the great weight of authority, we have held that the phrases 'out of' and 'in the course of' the employment are not synonymous, but are independent of each other, though closely related, that the proof of one does not invariably or necessarily establish the other, and that, by reason of the inclusion of both elements in the act, it is incumbent upon the claimant to prove them both, since the showing of the one without the other will not be sufficient to authorize

the making of an award. [Smith v. Levis-Zukoski Mercantile Co. (Mo. App.), 14 S. W. (2d) 470.]

"We have observed from the reported cases that the comprehensive definition of such terms has proved to be a matter of difficulty in very instance in which the giving of a definition has been found necessary. Generally speaking, it might be said that the phrase 'out of' refers to the origin or cause of the injury, while 'in the course of' refers to the time, place, and circumstances under which the injury was received. This, however, is but a roughly put distinction, more suitable for the layman than for the lawyer, and obviously too incomplete and unsatisfactory to be the basis for any action, judicial or quasi-judicial in character."

Mindful of the uniform ruling to the effect that the Workmen's Compensation Commission is clothed with the right and power to determine the truth of conflicting testimony, and that neither the Circuit Court nor this court may, on appeal, interfere with such right and power, nor pass on the weight of the evidence, we are constrained to hold that there is sufficient substantial testimony to justify the Commission in awarding compensation in the instant case.

It is in testimony as set out hereinbefore that Stiers specifically delegated to Pearce the job of handling Broyles' complaints, including the one about his not getting sufficient repair work to support his family, as he (Stiers) was fearful that Broyles, being a trouble maker, might cut the cables or set fire to the plant.

The further fact that the testimony tending to show that Broyles was resentful towards Pearce because he was made foreman, in place of himself, and his fault-finding about the operation of the plant while under Pearce's foremanship, was, when given credence by the Commission, sufficient, substantial, competent evidence to uphold the finding of the Commission that the assault, resulting in Pearce's death, did not arise out of a mere personal feud between Broyles and Pearce, growing out of the latter's alleged insults to Broyles' wife, but did arise out of and in the course of his employment.

It follows, therefore, that the judgment of the Circuit Court, upholding the award of the Workmen's Compensation Commission, should be affirmed, and, it is so ordered. *Becker* and *McCullen, JJ.*, concur.

## ON MOTION FOR REHEARING.

HOSTETTER, P. J.—Attorneys for the Sand & Gravel Company, employer, have filed a motion for a rehearing containing as one of the grounds the following: "Because the Court included matters

and statements in its opinion not included in the abstract of the record."

They argue that there was no testimony introduced on behalf of the dependents tending to show that Broyles found any fault with Pearce, the foreman, as to working conditions and assert that there is no testimony that Broyles murdered Pearce for any reason other than his charge that Pearce had insulted his wife.

It is true, as alleged in the motion for a rehearing, that on the hearing before the Hon. EDWARD C. LYNCH, Referee, the latter gave it as his opinion that from the evidence Pearce did not die as a result of an injury by accident arising out of his employment with the above named employer, therefore, compensation was denied.

Thereafter, the Commission made an order allowing the introduction of additional testimony and the additional testimony was heard by Commissioner SHAW, at which hearing the testimony of Melvin Martin and one other witness was heard.

The following excerpts from the testimony of Melvin Martin, we think, will clearly show that this court did not include any matters and things in the opinion that did not appear in the record.

In describing the fight which occurred about two weeks before the killing, the witness stated as follows:

"George accused Dick of trying to break up his home and he said, 'You fooled around until you got my job, if it hadn't been for you I'd be here yet working.' Then the fight started. Dick tried to reason with him but he just couldn't do it. Then they had their fight.

"Q. What happened after the fight; was that all of the conversation that took place at that time? A. Practically; yes, sir. George was drunk and he was cussing and going on, you know.

"Q. Go ahead? A. And after the fight I was standing by the corner of the machine shop and George said, 'You come here,- I'm going to give you some of it, too.' Meaning me.

"Q. Who was that, George Broyles? A. Yes, sir. He said, 'I'm no St. Louis gangster, I'm here by myself and I'm going to give you some. . . .

"Q. Go ahead. A. So I told him we'd never had any trouble and I had tried to be friends with him. Finally Tom, that is George's brother, Tom Broyles and George's wife got him in the car. As he started to get in the car he turned around and said, 'I'm coming back and get both you St. Louis son-of-bitches.

"Q. St. Louis son-of-bitches? A. Yes, sir; and Tom said, 'Come on, George, and let's go.' And George said, 'Those St. Louis gangsters are not going to come and run this place.' Finally Tom got him in the car and they drove off."

Witness Martin further testified:

832

"Q. You were out there (at the plant) from sometime in the middle of June to after this killing took place? A. Yes, sir. . . .

"Q. Do you recall whether during your stay there, prior to this fight, there was any discussion on the part of George Broyles with reference to his not getting enough work? A. Yes, sir.

"Q. And just who did he have that conversation with? A. Well, he spoke to me and complained about it, and he also talked to Mr. Stiers about it. He talked to Dick about it, too.

"Q. Can you fix the date when he first brought that up, how long it was before he left there? A. Not the exact date; no, sir.

"Q. Approximately how long before that? A. I would say approximately six weeks.

"Q. The first conversation he had with Dick Pearce, tell us just what that was. A. He told Dick he wasn't making enough money there to support his family, and if he couldn't get more money he was going to leave there.

"Q. Did he make mention of the distribution of the work, of having the cheaper men do it? A. Mr. Stiers had ordered that the expenses be cut as much as possible and work where we didn't need skilled laborer on common labor was given the work to do. Common labor was used instead of skilled labor whenever it could be done.

"Q. The skilled laborers were the 50-cent an hour men? A. Yes, sir, and common labor got 25 cents an hour, and the 25-cent men were used as far as possible.

"Q. Was there some discussion between them with reference to the distribution of the work? A. Yes; George said he thought he was entitled to all the repair work because he was the oldest man in the service there. We told him the reason for using the cheaper men, and he said it didn't make any difference—he should have all the repair work instead of giving it to the other men.

"Q. Later on was that same question brought up wherein Mr. Stiers was a party to the discussion? A. Yes, sir.

"Q. Who had that discussion, George Broyles with Mr. Stiers or Dick Pearce, if you were present? A. Sure, Dick mentioned it to Mr. Stiers and George mentioned it to him, too.

"Q. Were you present on both occasions? A. Yes, sir.

"Q. Tell us the conversation that George Broyles and Mr. Stiers had with reference to that? A. One night Mr. Stiers was out there fixing to go out fishing and George came down and out where Mr. Stiers was and he told Mr. Stiers that some of the men had been working the day before and he wasn't working, and he asked Mr. Stiers why he had the common labor work and not him. George made the remark then that Dick was running the place and he'd take up for George, meaning Mr. Stiers.

"Q. Was that all there was to that conversation? A. He told

Mr. Stiers that he wasn't getting enough out there, he wasn't getting enough work or working steady enough to support his family.

"Q. Now, were you present at any other time, prior to the time this fight took place, wherein George Broyles' employment there was discussed between Dick Pearce and Stiers? A. Yes, sir.

"Q. Relate that conversation. A. Well . . .

"Q. First, as I understood you, you say you came out there the middle of June? A. The first of June.

"Q. Can you fix the time, as near as you can with reference to the day of this fight, as to when this first conversation took place wherein the discussion of Broyles' employment was had between Dick Pearce and Mr. Stiers? A. I would say it was somewhere around the first of August. I can't give you the exact date, but I say somewhere around near the first of August. George kept on telling Dick he wasn't getting enough work, that he wasn't making enough to support his family or to justify him staying there, and Dick took up the question with Mr. Stiers, and Mr. Stiers said in one of the later conversations that he could put George on a car basis. He would pay him so much a car and he could do all the work he wanted to in one day or three days, and if he had enough work he could work all week and that he would make more money. Then they talked about putting George on a Moniter line up in Illinois in a coal field. That, I don't think, ever materialized. I don't think he ever got to go over there. Mr. Stiers said he thought that would be a good way to get George off the job.

"Q. Were you present at any conversation between Dick Pearce and Louis Stiers when the question of George Broyles' employment and getting rid of him out there was discussed? A. Yes, I heard it.

"Q. Can you fix the time as to the next conversation? A. I couldn't say the exact date; no, sir.

"Q. Just tell us approximately. A. It was approximately a week before George left.

"Q. Tell us now what took place. A. They were talking about the way George was carrying on, always hollering about not having enough work to do. Mr. Stiers said if he could put him on the Moniter over in Illinois and get another Hoister in his place it would be a good way to get rid of him. That was about a week before George gave notice he was leaving. . . .

"Q. I can't lead you into telling any conversation; I want you to fix a time with reference to any conversation you heard that involved the question of George Broyles and his work out there; fix the time first and then tell what took place. A. Well, on several occasions he talked to me. I believe it was the second Saturday night. I'm sure it was the second Saturday night before he left he come to me and wanted me to leave the place and go with him

on the farm. He said we would make more money on the farm. He said he should have the job there as superintendent of the plant, but he got a dirty deal, and he wanted me to go on the farm and go into the fish business with him. That was the second Saturday night before he left. I remember that because we all stayed at the house together. . . .

"Q. Did you or did you not hear a conversation between Dick Pearce and Stiers along about the first of September when there was some discussion about Broyles, and Stiers said he was afraid George would blow up the plant? A. Well, on one occasion that George was kicking so hard about the wages and at the time Mr. Stiers was there—

"Mr. Fairfield: Fix a time.

"The Witness: That was about two weeks before George left.

"Mr. Fairfield: Was that on the same occasion that Mr. Broyles had asked you to go fishing with him?

"The Witness: That was on a Sunday after he had asked me to go in the fish business with him on a farm.

"Mr. Friedewald:

"Q. Go ahead. A. Dick spoke to Lou about getting rid of him.

"Mr. Fairfield: Are you through?

"The Witness: Yes, sir; I think so.

"Mr. Fairfield (Q.): Who was the conversation between?

"The Witness: Mr. Pearce and Mr. Stiers.

"Mr. Fairfield (Q.): Where?

"The Witness: Out in front of the office.

"Mr. Fairfield (Q.): On a Sunday?

"The Witness: Yes, sir.

"Mr. Fairfield (Q.): What time on Sunday?

"The Witness: I would say about 9 or 10 o'clock in the morning.

"Mr. Friedewald:

"Q. Go ahead. A. Mr. Stiers said that they would have to work him out of there easy. He said he was afraid to anger the man because you couldn't tell what he would do. Dick said, 'Well, I don't think he will do anything.' And Mr. Stiers said, 'You can't tell what he will do. He's as apt to blow up the place as anything.'

"Q. As I understand it, George Broyles left there around September the 17th? A. Yes, sir.

"Q. Do you remember what day of the week he left on? A. One Sunday morning.

"Q. He moved his stuff on a Sunday morning? A. Yes, sir.

"Q. Did he come—when was the next time he came back? A. He came back Monday morning.

"Q. And was there anything transpired between him and Dick Pearce at that time? A. No, not between him and Dick then, because Dick was not there at that time.

"Q. Did you have any conversation with George at that time? A. Yes, sir.

"Q. What was that conversation then? A. Well, George came over and wanted to know where Dick was. I told him Dick hadn't come out yet, but he would be out about 10 o'clock as Dick had called me from town and said he woudn't get out until about 10. He had trouble with the car and didn't get there until 11 o'clock though; it was about 11:30, I guess, when he got there. George waited until about 11 o'clock before he left and it was right away after that that one of the men told me they were pulling Dick's car in. George told me while he was there Dick had caused him and his wife to separate and that there would be bloodshed over it. I talked to George and tried to reason with him and told him to let his wife go and he finally said that I was right and it would be better to just let her go. He said he wasn't going to do anything about it. I told Dick and he got ready to go back to town."

These excerpts effectually dispute the charge that the opinion contained anything in respect to the testimony which the record did not disclose and it is apparent that the charge that Broyles did not blame Pearce on account of working conditions is without foundation.

Since the opinion in the instant case was handed down on November 10, 1936, an opinion of our Supreme Court (not yet reported) was handed down on November 13, 1936, in case No. 34650, Sylvia v. O'Dell, Dependent, Respondent, v. Lost Trail, Inc., a Corporation, Employer, and New Amsterdam Casualty Company, a Corporation, Insurer, Appellants, in which the principle announced in the instant case was upheld.

In said O'Dell case, *supra,* the facts showed that a squatter killed an employee who had been directed by his employer to contact and make friends with the squatters located on a large area of wild, wooded lands in the Ozarks, which the employer desired to use in raising turkeys. The employee, with a companion, went to the home of a squatter early in the morning, with whiskey to pass around to create good fellowship, before the squatter's family had gotten out of bed.

He passed around the whiskey, which was partaken of by the squatter, who immediately arose from his bed, and the wife went to the kitchen and prepared breakfast. The employee made quite free with the two daughters of the squatter by putting the whiskey bottle in the bed between them and fondling and braiding the hair of one of them. The girls evidently resented this familiarity from a stranger and went into the kitchen. When breakfast was ready, the two visitors were invited in to breakfast but they refused stating that they had already had their breakfast.

The employee and the squatter engaged in a wordy argument as

to which one was the better hunter or could kill the most game, with the result that each took a shot at the other and the squatter's shot killed the employee.

The widow of the employee was allowed compensation, which award was upheld in said opinion. The quarrel and the shooting could have been attributed to the act of the employee in arousing anger on the part of the squatter and his family because of the undue liberties which he had taken with the two daughters, in which event no compensation could be allowed for the very obvious reason that the employee had entered upon a personal adventure of his own in taking these liberties with the girls; or, it could have been ascribed to an abortive effort on the part of the employee to cultivate and make friends with the squatter. He had taken the whiskey along with the knowledge and sanction of his employer. The Compensation Commission believed that the anger and resentment which resulted in the killing arose out of and in the course of the employment, either from their refusal to eat breakfast with the squatter, or the argument between the squatter and the employee, in which each sought to convince the other that he was the better hunter and could bag more game, etc., and not out of the personal adventure of the employee with the girls, and made an award of compensation which was upheld by the Supreme Court in said opinion.

Likewise, in the instant case the killing of Pearce by Broyles could have been ascribed to Broyles' enemity towards Pearce because the latter had been given the foremanship over him and because of his complaint about Pearce's operation of the plant and his failure to give him sufficient repair work to enable him to support his family.

There is the testimony of witness Martin that in the fight about two weeks before the killing Broyles did mention two grievances he had against Pearce. One was the alleged insult to his wife and the other was about being beaten out of the foremanship and that had not that been done he (Broyles) would still have been at the plant on his job.

It further appeared from the testimony of Pearce's widow that the superintendent of the Gravel Company had directed Pearce to handle the matter of Broyles' complaints instead of doing so himself for the reason that he feared that Broyles might cut the cables or set fire to the plant.

The Workmen's Compensation Commission believed the testimony to the effect that the killing grew out of the enemity in respect to the foremanship and the matters relating to the employment and we are satisfied, as was the Circuit Court, that there is sufficient, competent testimony in the record to support such a finding of fact, hence it is our duty to uphold the award. The motion for a rehearing is, accordingly, overruled. *Becker* and *McCullen, JJ.,* concur.