33 N.J. Super. 146 (1954)
109 A.2d 439
PAT AUGELLI, PETITIONER-APPELLANT,
v.
ROLANS CREDIT CLOTHING STORE, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Appellate Division.
Argued October 25, 1954.
Decided November 18, 1954.
*148 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Louis C. Jacobson argued the cause for the appellant.
Mr. A. Millard Taylor argued the cause for the appellee (Messrs. Carroll, Taylor & Bischoff, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
Petitioner suffered injuries during the course of his daily work through an assault and battery. Both the Division of Workmen's Compensation and the County Court denied compensation.
At the outset of our study of the matter, we note that the dismissal of the action, which occurred at the close of the petitioner's case, was grounded in a determination that as a matter of law the claim was not actionable. Therefore in our evaluation of the proof every reasonable inference must be resolved in favor of prima facie compensability. Kelly v. Hackensack Water Co., 10 N.J. Super. 528 (App. Div. 1950).
Augelli was in respondent's employ as a collector, and had been so engaged for about 14 years. His work required him to call at the homes and places of business of his employer's accounts. He used his own automobile in the pursuit of his task at the authorization of the employer, and the expenses incident to such use were paid by the employer.
One Saturday afternoon (Thursday, Friday and Saturday being the important collection days), four or five weeks before the assault in question, Augelli parked his car on a public street in Camden, New Jersey, in front of a business establishment and sent his son, who accompanied him, into the place to make a collection. When the young man returned, Augelli started the car and apparently began to pull out into the street. As he did so a horn was sounded and observation *149 revealed a standing red car which had been moving in the direction he was facing. The car had stopped probably because of Augelli's action in moving away from the curb. On seeing the situation, Augelli waved the car on and proceeded to follow it. The other driver for some reason proceeded very slowly, thus delaying Augelli, who blew his horn a few times. When the cars reached the next traffic light, the driver of the red car got out and came back to petitioner who was still in back of him. Augelli got out also and the other driver said: "That's my car up there." To which Augelli replied: "Well, get in your car and drive." That ended the conversation.
Four or five weeks later, on May 23, 1953, petitioner in the course of his employment called at the plant of De Media Lime Co. in an effort to make a collection from one of its employees. While he was on a loading platform there looking for the debtor employee, "a big fellow," another employee of De Media, unknown to Augelli, but later identified as Robert Belcher, accosted him. This person said, "Don't you know me?" After a negative answer, this conversation took place:
"`Don't you remember Kaighn Avenue?' I says, `No. I don't know what you are talking about!'
So he says, `Don't you have a '51 Mercury?' I said, `Yes.' And he went on and refreshed my memory.

* * * * * * * *
He said, `Don't you remember the red car?' He said, `Don't you remember something about traffic?' The exact words I can't remember, but he mentioned about the traffic incident.
Q. But he referred to the Kaighn Avenue incident?
A. That's right. And when he said red car and he mentioned about the horn blowing, then I realized what he meant; but I didn't know who he was at that time.
Q. Did you then recall the incident?
A. I did recall it then and I said to him: `Aw, forget it. I forgot it. You must have had a couple of drinks in you.' That's the exact words I told him."
Augelli then turned away and started to walk down the platform. Belcher followed and struck him from behind, causing the injuries for which compensation is sought.
*150 The deputy director declared that petitioner's conduct in blowing his horn made him an aggressor and that the subsequent assault was chargeable to that original provocation. He held also that in any event the lapse of four or five weeks between the highway incident and the assault broke the chain of causation and transmuted the conflict into a personal feud.
The County Court concluded that the original dispute was entirely unrelated to the employment and also that the lapse of time made the subsequent assault a personal one.
We have no doubt that if the assault had occurred at the time of the highway affair, the injuries would have been compensable. Such injuries must be considered to have arisen from "a hazard incident to the use of the highway in the pursuit of the master's business." Geltman v. Reliable Linen & Supply Co., 128 N.J.L. 443, 448 (E. & A. 1942).
Augelli's car was being used at the time in the employer's interest. If the delay caused by the other driver's driving conduct irritated him and prompted the blowing of the horn, that act did not fashion him into an aggressor and take him out of the course or scope of his employment. Nor did the vocal controversy which followed. For as the court said in the Geltman case, supra:
"Hot-tempered controversies respecting the management of motor vehicles on our busy thoroughfares are not at all uncommon. What happened was an accident directly attributable to a risk of the highway to which the employment exposed the victim; and it was therefore related to the employment in the statutory conception." (128 N.J.L., at 450.)
And see Sanders v. Jarka Corp., 1 N.J. 36 (1948); Gerard v. American Can Co., 32 N.J. Super. 310 (App. Div. 1954).
Thus we are brought to the more formidable issue in the case, namely, the effect of the passage of four or five weeks between the automobile altercation and the assault. The evidence is clear that the two men did not know each other, did not see each other between the two events, and that the producing cause of the final fracas was the highway wrangle. Does the time interval destroy the employment as a contributory proximate cause of the injury?
*151 The cooling-off period is naturally a circumstance to be considered; but of itself it should not be controlling. See 1 Larson, Workmen's Compensation, § 11.13 (1952). The basic problem remains, whether the employment originated controversy was the cause or a contributory producing cause of the ultimate assault. It is neither reasonable nor consonant with the spirit of the Workmen's Compensation Act to declare unqualifiedly that the mere passage of time, with its opportunity for reflection, wipes out the occupational origin and connection and transforms the attack into a personal feud.
Although the time element is a definite factor for consideration, it is secondary to the principal or controlling factor, that is, the relation between the attack and the employment. A contrary view would be unrealistic. As Larson points out (§ 11.13), the victim in a case like the present one has no control over the interval between the two incidents. The control is in the mind of the aggressor. That he nursed a grudge of employment-related origin for an inordinate length of time ought not to militate against recovery by his victim.
In Pearce v. Modern Sand & Gravel Co., 231 Mo. App. 823, 99 S.W.2d 850 (Ct. App. 1936), the decedent and his assailant were co-employees. Decedent was made foreman, which the assailant resented because of his longer service in the plant. The testimony indicated also that he held Pearce responsible for his failure to receive sufficient work to maintain his family.
The attacker quit his employment, alleging dissatisfaction with the irregularity of his work. Three or four weeks later he shot and killed Pearce. The death claim was held compensable as resulting from an employment originated enmity stemming from the foremanship of Pearce and not from a personal feud.
Again, in Franklin Coal & Coke Co. v. Industrial Commission, 322 Ill. 23, 152 N.E. 498 (Sup. Ct. 1926), petitioner Trott and one Beam were fellow employees in a mine. About six days before the assault, Beam assigned some difficult *152 work to Trott and a violent verbal quarrel ensued. There was never any other trouble between them and according to the record the sole cause of their quarrel and ill feeling toward each other was Trott's accusation that Beam had not given him fair treatment in his designation of work. It appeared also that on the intervening days between the quarrel and the assault they did not speak to each other. Six days later Beam quit his job and shot Trott before leaving the premises.
The Supreme Court of Illinois held that the resulting injury claim was compensable, saying:
"We think the evidence shows clearly that the injury in question arose out of Trott's employment. It was the direct and final result of the quarrel that the two employees had over the question of whether or not Beam was treating Trott fairly in designating the hauls or trips that Trott should make for him and on his run as a driver. This appears from the last words that were passed between them as Beam stood with his coat and all his clothes on, under the shower while looking at Trott. When Trott told him to stand back or he would get his clothes wet, Beam replied that he could not get along with him `and he drawed his time,' meaning thereby that he had quit the coal company because of his quarrel with Trott. Trott simply replied, `Not as long as you are trying to hand me a package like you are.' Beam then said, `I will give you a little worse,' and without any further explanation or further words he walked to the door, turned, and shot at Trott six times. In this final meeting when he was shot, Trott was not the aggressor and had not done anything that would provoke a quarrel out of any reasonable man on that day and time. The whole evidence tends to show that Beam was still harboring malice against Trott that was engendered by reason of the quarrel over the question of the division of work a few days previous, and that he had quit the employment and received his final pay with the expectation and intention of taking his revenge on Trott, so that he could make his escape without having any further occasion to delay his flight by collecting what was due him. The fact that Beam had just a few hours previous to the shooting severed his connection with the company does not in any way, so far as we can see, affect the question as to whether or not the injury arose out of the employment and by reason of it." (152 N.E., at pages 499, 500.)
In Hegler v. Cannon Mills Co., 224 N.C. 669, 31 S.E.2d 918 (Sup. Ct. 1944), it appeared that Hegler and one Smith were fellow employees. Friction developed between them *153 over Hegler's unauthorized attempts to direct Smith's work, and his complaints about the manner in which the work was done. This went on for about a year. Finally, Hegler reported the matter to the employer, which angered Smith, who threatened to get even. Among other things Smith said he had given notice to quit and intended to kick Hegler "all over the cloak room before leaving."
Two days later Smith came into the department where Hegler worked and called to him. Hegler walked away but Smith followed and struck him on the head, killing him.
The Supreme Court of North Carolina referred to the finding of the Industrial Commission that:
"The deceased and Smith never had any association, one with the other, outside the mill. They never came in contact with each other except in the mill."
And it held:
"While the assault may have resulted from anger or revenge, still it was rooted in and grew out of the employment."
The employer here relies upon Yoshida v. Nichols, 12 N.J. Misc. 197 (Sup. Ct. 1934), and Container Corporation v. Industrial Commission, 401 Ill. 129, 81 N.E.2d 571 (Sup. Ct. 1948).
In the Container Corporation case, one employee accidentally dropped a roll of paper on another. At this a profane exclamation was projected in the direction from which the roll came. The one responsible for the mishap was a new man and he merely replied, "We all got to learn." Thirty minutes later the new employee, having completed the particular project on which he had been working, stood near a drying machine to cool off. The employee who had been struck by the paper approached him and in an abusive manner said he was going to cut his throat. At this the threatened employee knocked the other down and when he got up knocked him down again, causing injuries from which death ensued.
*154 The Supreme Court of Illinois denied compensation, saying that at the time the fatal injuries were inflicted neither man was engaged in the duties of his employment and that when the decedent used the antagonistic words which were such as might cause an altercation, "he stepped outside the scope of his employment, and by so doing he stepped outside the protection of the Workmen's Compensation Act." The court concluded that the throat-cutting threat constituted him an aggressor and removed him from the protection of the Workmen's Compensation Act. It is not necessary for us to decide whether in such a situation compensation would be denied in New Jersey. It is sufficient to say that no such facts are present in the case before us.
The Yoshida case is also distinguishable. There two house-workers had a dispute during their work, one taking the other to task for appropriating flowers which the first worker thought were to be used by him in decorating certain rooms. Five days later the one taken to task "caused" the other to go out doors and then assaulted him.
The Supreme Court rejected the compensation claim. Justice Case pointed out that there was no proof as to what the two men did with respect to each other in the intervening five days and no proof as to what had happened between them before the flowers incident or thereafter, although "those matters were easily susceptible of full proof." Further, no evidence was adduced to show that at the time of the assault anything was said which would trace the attack to the earlier dispute.
The court said:
"We are asked to find that Lakamoto made the assault because five days before he resented something that Yoshida had then said to him; but we conclude that the causal connection has not been established either by direct proof or by reasonable inference. In other words, we are unable to trace the act to the employment in terms of causation. That being so, it is beside the point to consider whether, so connected, the act would be an accident arising out of the employment within the meaning of the statute." (12 N.J. Misc., at page 198.)
*155 The absence of analogy is manifest. In the present case, the proof shows that Augelli and his attacker were not acquainted and had no contact with each other in the interval between the highway dispute and the assault. Consequently, this controversy was the only cause for trouble between them. Moreover and more important, the only conversation between them at the time of the assault concerned that controversy and demonstrated that it and it alone fostered the attack. Therefore, it cannot be said that the cessation of hostilities at the first encounter broke the chain of causation so as to take the petitioner's claim out of the protection of the Compensation Act.
It is interesting to note that in the Franklin Coal Co. case, supra, it was considered significant that the men did not speak to each other at work between the employment dispute and the assault, and in the Hegler case that in the intervening period the two men had no association or contact with each other outside the mill. Thus, as distinguished from the Yoshida case, the state of the record was such as to lead to the conclusion that the employment connected controversy was the reasonably probable cause or the reasonably probable contributory cause for the assault. That crucial difference which they have in common with this case, removes the Yoshida case as a bar to compensation.
Under the circumstances, the judgment is reversed and the cause remanded for retrial.