# MARCH, 1938.

FLORA CARLTON AND JUANITA CARLTON, RESPONDENTS, v. BERRYMAN HENWOOD, TRUSTEE, ST. LOUIS-SOUTHWESTERN RAILWAY COMPANY, DEBTOR, EMPLOYER, APPELLANT.—111 S. W. (2d) 172.

Springfield Court of Appeals.   March 7, 1938.

Rehearing denied April 14, 1938.

166

*A. H. Kiskaddon, Carlton S. Hadley* and *Harry C. Chapman* for appellant.

*Stephen Barton* for respondents.

FULBRIGHT, J.—This is a proceeding under the Workmen's Compensation Commission which reached this court on the appeal of the employer from the judgment of the circuit court of Scott county reversing an award of the commission and remanding the cause.

On November 1, 1935, the widow and daughter of W. T. Carlton filed their claim for compensation in the amount of $6,000 for the death of the said W. T. Carlton and $500 for funeral expenses, alleging that deceased "was employed as a pumper, repairman, watchman and caretaker of pump station and premises at Gray's Point, and in entering said station to investigate a burglary he was shot and killed by a burglar who had broken in the building." Employer filed its answer, and it was admitted on a hearing before one of the referees of the commission, March 30, 1936, that the only issues in the case are "whether or not the employment of the deceased employee comes under the compensation law of the State of Missouri, and, second, whether or not the death of the employee was a result of an accident arising out of and in the course of his employment." The referee entered an award, answered the first question in the affirmative, the latter in the negative, and denied compensation. Following the entry of the referee's award, an application for review by the full commission was filed; and on August 8, 1936, an award was entered affirming that of the referee. The claimants appealed to the circuit court where,

on November 25, 1936, the court entered its judgment reversing the award and remanding the cause to the commission "with directions to make a finding of the amount of compensation due plaintiff under the undisputed facts and the law of the case." The appeal of the employer to this court has followed in the usual course.

The record discloses the following stipulation:

"It is hereby stipulated and agreed by and between the parties in this case that W. T. Carlton was in the employ of the St. Louis Southwestern Railway Company on May 8, 1935, and had been for a period of more than one year prior thereto; that the employee's salary was $125 per month and had been for the year prior to May 8, 1935; that the St. Louis Southwestern Railway Company was a major employer and; so far as any liability of said company under the compensation law, they were authorized self insurers; that the employer had notice of the accident and that claim for compensation was filed within time prescribed by law, having been received by the commission on November 4, 1935; that on or about 9 p. m. of said May 8, 1935, said employee was shot by highwaymen while in the pump house of said St. Louis Southwestern Railway Company in Scott county, Missouri, said pump house being immediately adjoining and a part of the same building occupied by employee as his living quarters; that the highwayman had secured entrance to the pump house by breaking and entering a window on the west side of the pump station; that these highwaymen were in the living room of his house at the time the shots were fired, the employee being in the pump house. It is further stipulated and agreed that the deceased died at 10 p. m. the same night as a result of said wounding, and that he left surviving him his widow, Flora Carlton, aged 29, and his daughter,[1] Juanita Carlton, aged 19, both totally dependent upon the employee."

It is further shown by the evidence that the pump station at which Mr. Carlton was killed is located on the Mississippi river about four miles from Illmo-Fornfelt terminal of the St. Louis Southwestern Railway Company in an isolated and sparsely populated section. Water is pumped from the Mississippi river into a settling basin at Gray's Point, and then into a large water tower at the roundhouse at Fornfelt, and is used by trains and by shops, offices, and factories in Illmo and Fornfelt. There are two pumps, one in the building used as living quarters for W. T. Carlton and claimants which is electrified, the other located about a quarter of a mile up the river which is run by both electricity and steam.

Mr. Carlton was paid $125 per month, and his living quarters, fuel and lights were furnished by the employer. Mrs. Carlton testified that sometimes Mr. Carlton was required to be on duty almost twenty-four hours a day. "Of course, he didn't work all the time like that, but if he had trouble on anything he had to work that way." He was employed as a pumper-repairman, and on occasions, sometimes at

---

[1]Stepdaughter.

night, he would repair the pump, replace fuses, and at all times, do such repair work as was incident to such a plant. On some occasions Mr. Carlton would start the pump at five o'clock in the evening and shut it off at two in the morning. He looked after the premises, mowed the lawn, cut the weeds, cleaned the three settling basins, and looked after the premises and property generally. He had no set time to start and stop the pumps, that being determined largely by the amount of water used. He was never away from the station more than three or four hours at a time.

Mrs. Carlton testified that Mr. Carlton was required to live in the living quarters adjoining the pump station in which he was killled. We quote from the record: "Q. You say Mr. Carlton was required to live there; do you know that as a fact? A. Yes, sir. Q. On what do you base your knowledge? A. Well, they built the home for us and required him to move up there. Q. Couldn't live in town if he wanted to? A. No, he couldn't." Mrs. Carlton further testified that no watchman was furnished Mr. Carlton to look after the premises. Mr. Carlton did that. "The other station up the river was broken into by pilferers breaking down the door. Mr. Carlton ran them away. On the date that Mr. Carlton was killed he had put up new screens, painted the screen wire and casings in the pumping station, and had cleaned the motors. At 6:15 on the evening he was killed he went to Cape Girardeau to get a little fresh air, as the painting had made Mr. Carlton ill. He returned to the pumping station at nine o'clock in order to turn on the pumps."

When the Carltons returned, there was a light in the portion of the building they occupied as their home. They put the car in the garage and Mr. Carlton entered the pump house as was his custom. The light was burning in the pump house when he left, and it was on when he returned. The light went off in the living quarters, and immediately after Mr. Carlton entered the pump room, Mrs. Carlton heard a shot. The shot was fired from the living quarters and Mr. Carlton was found mortally wounded in the pump room. Mrs. Carlton also testified that although Mr. Carlton was not required to carry a gun, he carried one, and had it with him when he went in the pump house that night.

From re-cross examination of Mrs. Carlton we quote: "Q. Now, was Mr. Carlton going back to that pump house that night to do any repair work? A. He was just going back to start the pump."

After Mr. Carlton was shot the highwaymen asked Mrs. Carlton for money. It was admitted that she had about $425. "Q. And they asked for that money? A. They asked for some money."

The testimony of Juanita Carlton was, in substance, the same as that of Mrs. Carlton. She testified that the pumps required almost constant attention; that Mr. Carlton was frequently called during the night to shut down the motors when the water tower would run

over; that he did repair work as required, both day and night, such as replacing bearings and fuses; and if anything went wrong and the power was shut off he would receive a call from Illmo notifying him to start the motors.

William Proffer, manager of the Missouri Utility Company, stated that he serviced the station at Gray's Point in May, 1935, and prior thereto; that he had been called frequently by Mr. Carlton to come out to the pumping station at night in order to help him fix the pumps; that he had seen Mr. Carlton take care of the motors in the pumping station at night and had often seen him working about the machinery after midnight.

James Wagner testified that he lived in Illmo; that he had been frequently at the Gray's Point pumping station; that he had seen Mr. Carlton making repairs on the machinery in the pumping house at night and that it was not possible to operate the pump from seven until five in the day and then shut it off without further attention.

Luther E. Morse, present pumper at the Gray's Point station, testified, in part, that he did not know whether the conditions in the pumping station were the same when he took charge as they were when Mr. Carlton operated it, as he did not take charge immediately. We quote from the record:

"Q. Can that pump, Mr. Morse, be operated steadily over, say, a period of from 7 until 4 and be shut off, and given no further attention, and perform the duties that it is supposed to perform under service? A. Well, which pump are you talking about?

"Q. The whole plant out there. A. No, it couldn't.

"Q. It couldn't? In other words, does it require attention to operate it at nighttime as well as in the daytime, with one man? A. Well, it doesn't require any attention after it is put on. . . .

"Q. How long will it run? A. It runs different; depends on the amount of water you have to pump.

"Q. Do your duties require you to work at night to properly operate the pump? A. No, not necessarily.

"Q. Well, in the operation of the pump—do you work at night up there? A. No, sir.

"Q. Do you turn it off at any time? A. Well, not since I have been there I haven't turned it off any time during the night; it is always 7 o'clock. . . .

"Q. Then you mean that you could perform the duties of operating that pump station out there by working from 7 o'clock until 4 and quitting, and that is all you would have to do; wouldn't have to give it any attention during the night to properly operate it? A. No.

"Q. You wouldn't have to give it any attention? A. You couldn't do that. . . .

"Q. Suppose the water tower was filled by the pumping around

midnight, what would, you be required to do? A. Get up and shut the pump off.

"Q. Where would you get your information? A. By telephone.

"Q. Are you required to live on the premises? A. I don't know that I am required to; nothing specified that I am required to.

"Q. Do you occupy the same quarters occupied by Mr. Carlton at the time of his death? A. Yes, sir."

He also stated that a watchman was furnished when one was needed, and that one was needed only in cold weather to keep the plant from freezing; that he himself was not employed as a watchman but that his official capacity was pumper. We quote from his testimony again.

"Q. Do you work under any agreement with reference to the union? A. Yes, sir.

"Q. What is that agreement; do you work—what hours do you work under that agreement? A. There are no specified hours.

"Q. Do you know whether or not you are required to live on those premises? A. No, sir, I don't. . . .

"Q. Does the railroad furnish that house to you for nothing? A. Yes, sir.

"Q. It isn't part of your compensation? A. No, sir.

"Q. If you lived in town you would still get the same rate of pay, wouldn't you? A. Yes, sir.

"Q. Could you operate that station living in town if you wanted to? A. No, sir, I don't believe I could.

"Q. Why not? A. Well, the tower would run over and the pump stop; I would have to be there to take care of it.

"Q. Can't you regulate those pumps so that you can either turn them on or shut them off at 7 o'clock and not touch them until 7 o'clock the next morning? A. No, sir.

"Q. You can't do that? A. No, sir.

"Q. Over what period of the day are you supposed to work? A. Well, there is no specific time; I work to suit myself.

"Q. Is it a twenty-four-hour job; in other words, you are supposed to be there all the time? A. Well, not exactly; supposed to be there, but I go up town, to Cape, in the afternoons.

"Q. Any time that you may have things in order, then you can leave the premises, can't you? A. Yes, sir."

Claimants' exhibit No. 2, a letter to Mr. Carlton from J. B. Livingston, his superintendent, contains the following: "Wish to advise that I thought we reached an agreement whereby the $125 per month paid you, together with house rent, lights, garden spot and fuel, was to cover all services rendered. This job in town would be worth about $175 per month figuring in your house rent, light bill and fuel bill.

. . . I hope that in the future you will consider these matters and continue to handle the plant in a manner that is satisfactory to all, and in case you do not desire to continue on this job at the present rate for all services rendered, I will arrange for another man."

Claimants' exhibit No. 3 is another letter from Mr. Livingston addressed to Messrs. W. T. Carlton and C. D. Bedwell, parts of which follow: "Effective March 16 Mr. W. T. Carlton will be paid $125 per month and continue as head pumper in charge of entire pumping facilities at Gray's Point. . . . At the present time will not make any assigned hours and Mr. Carlton will handle to the best advantage. . . . Please handle accordingly and let me have your full cooperation in this matter."

The only defense witness offered was Mr. Charles M. Meyer who testified.

"I am employed as a supervisor of water supply of the St. Louis Southwestern Railway Company, and have been so employed in that capacity since September 12, 1922. I am the supervisor of the Gray's Point pumping station and at the present time have nine pumpers under my supervision. I was the supervisor of the pump at Gray's Point on May 8, 1935. Mr. Carlton was employed as a pumper-repairman there.

"Q. Pumper-repairman. Was it mandatory that he occupy that house? A. As far as I know it was not.

"Q. Do you know why he occupied the house? A. Well, I don't know positively, but I presume to make it more convenient for him.

"Q. Could he have lived at Illmo so far as you are concerned? A. Yes, sir.

"Q. And operate the pumps at Gray's Point while living at Illmo? A. Yes, sir. . . .

"Q. Was Carlton a member of any labor union? A. Yes, sir.

"Q. What was that union? A. Maintenance of Way organization. . . ."

Section A from employer's exhibit was read to the court, as follows:

"The following positions not requiring continuous manual labor and the work of which is of a light and intermittent character will be paid a monthly rate which shall compensate for all services rendered for eight hours work within a spread of twelve hours for the calendar days per month, overtime pro rata on the actual minute basis. Hours to be worked will be regularly assigned from time to time, and pumpers' hours assigned will be based on the average of the daily hours required."

Continuing Mr. Meyer's testimony: "Q. You said that Mr. Carlton could live in town if he so desired? A. Yes, sir.

"Q. Could he, assuming he wished to live in town, could he operate those pumps so as to either turn them on or shut them off at 7 o'clock and be away from there until 7 o'clock the next morning?

A. Yes, sir; he could regulate that pump that pumps to Fornfelt; you could regulate that by the discharge valve on the discharge *side* of the pump so it would pump 100, 200, 250 gallons a minute.

"Q. Is that practical? A. Yes, sir; if you want to run it over a longer period of time you can open it wide and it will pump 250 gallons a minute; and close the discharge valve and decrease the discharge as low as 100 gallons a minute.

"Q. Then Carlton could arrange his hours so that he could leave there at 7 o'clock and not return until 7 next morning? A. Yes, sir.

"Q. That could be done? A. Yes, sir.

"Q. And he wouldn't have to return during the night? A. No, sir.

"Q. Were there any repairs made to the pump on this particular night, night of May 8th? A. Not to my knowledge. . . .

"Q. Was Carlton a watchman? A. No, sir; not to my knowledge.

"Q. Did you have any watchman for these pumps? A. Not the pump stations; no, sir.

"Q. He wasn't required to carry a gun? A. I didn't even know he carried one.

"Q. Was he required to be at the pump stations at night in order to watch these pumps? A. Not to my knowledge.

"Q. Was he required to be there at night to operate the pumps? A. If he was it was something I didn't know anything about.

Q. By what trains was the water used? A. Used for all freight and passenger trains.

"Q. Interstate trains? A. Yes, sir.

"Q. Does the pump serve these other stations—not stations, but factories and electric light plants that were testified to on direct examination? A. Yes, sir.

"Q. Those plants are located in Missouri, are they? A. Yes, sir.

"Q. Is the present pumper at Gray's Point station required to live on the premises? A. Not to my knowledge.

"Q. May he turn on or shut off the pumps at 7 o'clock and leave there and not return until the next morning if he so desires? A. Yes, sir. . . .

"Q. Does he have to live there to watch those pumps? A. No, sir.

"Q. Does he have to live there to protect the company property? A. As far as I know, he doesn't.

Cross examination: "Q. Mr. Meyers, isn't it one of the duties of a pumper to repair the machinery? A. Not all of them; no, sir.

"Q. Wasn't it the duty of Mr. Carlton to repair the pumps? A. Light repairs, yes, sir.

"Q. Light repairs? A. Yes, sir.

"Q. In other words, like packing the pump, it was his duty to do that? A. Yes, sir.

"Q. If that pump went down at night, then he was supposed to do that kind of repairing, wasn't he? A. Well, I wouldn't say that it was necessary for it to be done that night; only in extreme cases.

"Q. So those kind of repairs, they were supposed to be looked after by him? A. Yes, sir.

"Q. And if they developed in the nighttime, and it would close down the plant, then, of course, you expected him to repair it? A. Yes, sir.

Q. You say that Mr. Carlton during the years, say four, five, six, seven, eight back of 1935, could live at Illmo and operate this pump? A. After they electrified the plant he could.

"Q. Well, he could turn that pump on at night and just go away and the efficiency of that plant wouldn't be jeopardized at all by his absence? A. Not a bit.

"Q. Suppose it runs over? A. It can be regulated so it won't run over, got gauges and valves and everything to work on.

"Q. Suppose the machine gets out of order and needs some of this repairing? A. That could be done in the daytime.

"Q. Suppose it happened at night? A. The pump would just shut down, that is all.

"Q. The pump would just shut down; and if the water was consumed up there you would just be out of water? A. Yes, sir.

"Q. Now, does the fuse ever burn out on the machinery? A. Yes, sir.

"Q. Very frequently in the plant down there? A. Can't say as to how frequently.

"Q. If it happened down there the whole plant would shut down? A. I can't say that one fuse would shut the whole plant down.

"Q. Would it interfere with the operation? A. It would interfere with the operation of that particular pump.

"Q. Do you know whether it is to take care of those little contingencies or emergencies that he is required to be on the premises there? A. I don't know that he is required to be on the premises there."

The assignment of errors is as follows:

"1. The court erred in reversing the award of the commission and remanding the cause upon the ground that it misconceived and misapplied the law and the facts in the case.

"2. The court erred in reversing the award of the commission upon the ground that the facts found by the commission do not support the findings of the commission.

"3. The court erred in failing and refusing to hold that the finding of the commission that the employee's death did not arise out of and in the course of his employment was binding and conclusive and required an affirmance of the commission's award.

"4. The court erred in failing to affirm the commission's award."

Obviously, the determination of these issues required us to read the record for ourselves, bearing in mind that an award of the commission has the force and effect of a verdict of a jury and cannot be disturbed by an appellate court if there is any competent substantial evidence to support it; that in determining whether the commission's award is justified by the evidence the reviewing court will look only to the evidence most favorable to the award, together with all reasonable inferences that may be drawn therefrom that seem to support the award, and must disregard all opposing and unfavorable evidence, and this is true even though a finding of the commission to the contrary would also have been supported by the evidence; and that the weight of the evidence and the credibility of the witnesses are for the commission to determine. [De Moss v. Evens & Howard Fire Brick Co., 57 S. W. (2d) 720; Hoffman v. Missouri Pacific Railroad Co., 63 S. W. (2d) 427; Jackson v. Curtiss-Wright Airplane Co. et al., 68 S. W. (2d) 715; Bicanic et al. v. Kroger Grocery & Baking Co. et al., 83 S. W. (2d) 917; Gantz v. Brown Shoe Co. et al., 90 S. W. (2d) 168; Gleason v. Titanium Pigment Co. et al., 93 S. W. (2d) 1039; Pearce et al. v. Modern Sand & Gravel Co., 99 S. W. (2d) 850.]

· It must be further borne in mind that the award of the commission is not binding on the circuit court on appeal unless there be competent substantial evidence in the record to support such award, and it is the duty of such court to examine the record, and even though there be some evidence which supports the award of the commission, if it be not legally sufficient, or if it be of such a nature as to be lacking in sufficient probative force to sustain the award, it is the duty of the court to reverse such award and remand the cause. [Section 3342, Revised Statutes Missouri 1929; Kenser v. Ely & Walker Dry Goods Co., 226 Mo. App. 1016, 48 S. W. (2d) 167; Yancey v. Egyptian Tie & Timber Co., 95 S. W. (2d) 1230.]

Also, if the facts in a composition case are in dispute, the finding of the commission is conclusive upon appeal if there is substantial evidence to support it, but whether such finding is so supported is a question of law calling for a decision on the record. [Biswell et al. v. St. Louis San Francisco Ry. Co., 49 S. W. (2d) 203; Thurman v. Fleming-Young Coal Co. et al., 49 S. W. (2d) 288.] And where facts are undisputed, a commission's finding that the accident did not arise out of and in the course of the employment is a question of law and is not binding on the appellate court. [Baker v. Scott County Milling Co., 20 S. W. (2d) 494; Sawtell v. Stern Bros. & Co., 44 S. W. (2d) 264; Russell v. Ely & Walker Dry Goods Co. et al., 60 S. W. (2d) 44; Maltz v. Jackoway-Katz Cap Co. et al., 82 S. W. (2d) 909.]

Since the subdivisions of the assignment of errors are so closely related they will be considered together. It is contended by employer that Mr. Carlton was not employed as a watchman or caretaker. It

is true he was not so employed, but under all the evidence and undisputed facts, in addition to his work as pumper and repairman, he did the work peculiar to that of a watchman or caretaker with full knowledge of the employer. For a number of years three men worked on the job, Mr. Carlton being head pumper, the others working under him; and after the pumps were in part electrified Mr. Carlton and Mr. Bedwell rendered this service, Mr. Carlton as head pumper and Mr. Bedwell as assistant. Subsequently, Mr. Bedwell was released and Mr. Carlton was in complete charge; fixed his own working hours, and was on duty twenty-four hours of the day, not constantly, of course, but ready for duty whenever his attention was required. At the time he was killed he had returned to the pump station, after an absence of three or four hours on his own business, to do that which he had previously planned to do and as a part of the duties required of him; that is, to start the pump. The pump was in a room adjacent to, and a part of, the building occupied by Mr. Carlton and his family; built, owned, lighted by electricity, and maintained by defendant employer for its and the pumper's convenience. As to whether Mr. Carlton was shot in the act of starting the pump, or was shot in an effort to eject the intruders who had broken the window in the pump house and taken possession of the building, we think, is of no consequence. In either event, he was serving his master and out of his effort the accident arose which caused his death. This being true, as Judge RAGLAND stated in the case of Leilich v. Chevrolet Motor Co., 40 S. W. (2d) 601, "why split hairs in trying to trace a 'causal connection' between his employment and his death." [Sweeny v. Sweeny Tire Stores Co., 49 S. W. (2d) 205; Beem v. H. D. Lee Mercantile Co., 337 Mo. 114, 85 S. W. (2d) 441; Kinkead v. Management & Engineering Corp. et al., 103 S. W. (2d) 545.]

It is insisted by the employer that Mr. Carlton was not required to occupy the living quarters in the building in which the pump was located and that he could have lived at Illmo and so arranged his hours that his services would not have been required at the pump station at 9 o'clock on the evening he was killed. However, he did occupy these living quarters with the sanction and desire of his employer, since as a special inducement, his lights, fuel and other incidentals were furnished him free of charge. Perhaps he could have arranged to start the pump at a different hour on the evening that he was killed so that it would not have been necessary for him to be present at that time, but he could not anticipate a robbery at that particular hour, or the tragedy that resulted when he returned to his work. The facts are undisputed that Mr. Carlton was in control of the pumping facilities, had complete supervision thereof, and had authority to operate the pump at such times, day or night, as was necessary to keep a sufficient supply of water. Assuming that Mr. Carlton could have lived at a different place and that he could have

176

arranged to start the pump at a different hour on that fatal evening, he was not required so to do, therefore, on the face of this record, it would in no way change the result, and the position taken by appellant is wholly without merit.

Under the evidence before us there can be no question but that the accident arose in the course of Mr. Carlton's employment. It occurred within the period of his employment at a place where his employment required him to be, and while he was reasonably fulfilling the duties of his employment, or engaged in doing something incidental thereto. [Reed v. Sensenbaugh, 86 S. W. (2d) 388.] To decide whether it grew out of his employment is a more difficult question. An accident may arise in the course of employment and yet not arise out of it. As stated in the case of Leilich v. Chevrolet Motor Co., supra,

"There is no justification for investing the words 'arising out of . . . his employment' with a technical meaning; they are plain, ordinary, and everyday words, and should therefore be given their plain, usual, and ordinary meaning. Every case involving their application should be decided upon its own particular facts and circumstances and not by reference to some formula. . . . It is not necessary, therefore, that such accident should have been one reasonably to be anticipated as an incident of the employment. The only question is whether it did in fact arise out of and in the course of the employment. . . . It is of no significance whether the precise physical harm was the natural and probable or the abnormal and inconceivable consequence of the employment." [Phillips v. Air Reduction Sales Co., 85 S. W. (2d) 551.]

Furthermore, Mr. Carlton had no idea who was in his house, whether friend or foe; and if an enemy, whether harm was intended to him personally or was directed against the property of his employer. It seems to us that he was faced with an emergency and acted under a sudden impulse to protect the property of his employer. To illustrate; suppose that long after customary working hours, in the dead of night, he had discovered a fire in his living quarters, or in the pump house, and in attempting to extinguish the fire he was injured. Could it be said that such an accident did not arise out of the employment merely because he was not employed as a fireman and had no instructions from his employer in regard to fires? The courts are not inclined to be severe upon employees who are injured by attempts to further the employer's business, although the attempt is in a line somewhat outside the precise scope of the employment. Mr. Carlton was not employed as a watchman, it is true, but he was performing the same services he was in the habit of performing when he was injured; as well as attempting to protect his employer's property and to regain possession thereof, a useful and helpful act for his employer, although outside the special duties which he was employed to perform, and he could not be considered a volunteer. [Sweeny

v. Sweeny Tire Stores Co., supra; Edwards et al. v. Ethyl Gasoline Corp. et al., 112 S. W. (2d) 555.]

We find no case in Missouri similar to the one at bar, but we believe a North Carolina case, Goodwin et al. v. Bright et al., 163 S. E. 576, is in point. In that case the deceased employee was required to be at his employer's planing mill between five and seven o'clock in the morning to fire the boiler, an hour and a half before the other employees arrived. He was shot and killed by a robber while he was in the boiler room. His body was found at 7 a. m. by a fellow employee. He had been robbed of his money and his car had been stolen. It was held that the employee's death arose out of and in the course of his employment.

In view of the undisputed evidence in the record before us, the nature and character of the employment in which Mr. Carlton was engaged, and the purpose and intent that motivated his action at the time he was shot, we are irresistably led to the conclusion, and so hold, that the accident and resulting death of Mr. Carlton arose out of and in the course of his employment. We further find that there is no substantial competent evidence to the contrary, and that the finding of the commission that the accident did not so arise is not supported by any evidence, and consequently, there was no basis for the award made by the commission in which compensation was denied.

The judgment of the circuit court, as heretofore stated, remanded the cause to the commission "with directions to make a finding of the amount of compensation due plaintiff under the undisputed facts and the law of the case." It is our opinion that under section 44 of the Compensation Act, Laws 1927, page 512 (Mo. Stat. Ann., sec. 3342) the judgment of the circuit court should be modified by striking out the directions "to make a finding of the amount of compensation due plaintiff under the undisputed facts and the law of the case." [Schulz v. Great Atlantic & Pacific Tea Company (Mo. Sup.), 56 S. W. (2d) 126; Russell v. Ely and Walker Dry Goods Co. (Mo. Sup.), 60 S. W. (2d) 44.] The judgment of the circuit court, as modified, is affirmed, and the cause remanded with directions to the commission for rehearing; the commission to make such orders or awards as it deems proper not inconsistent with this opinion. *Allen, P. J.,* and *Smith, J.,* concur.